# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### April 29, 2003 Session

## STATE OF TENNESSEE v. ANGELEE PRATER

**Direct Appeal from the Circuit Court for Rhea County**
**No. 15552     J. Curtis Smith, Judge**

---

**No. E2002-01774-CCA-R3-CD**
**October 17, 2003**

---

The appellant, Angelee Prater, was convicted by a jury of aggravated child abuse, a Class A felony and fined $25,000. As a result of the conviction, the trial court sentenced her to twenty-one years and six months incarceration as a Range I, standard offender and classified her release eligibility at 100% as a violent offender. After the trial court denied the appellant's motion for a new trial, she appealed. The appellant argues on appeal that the aggravated child abuse statutes, Tennessee Code Annotated sections 39-15-401 and -402 are unconstitutionally vague as applied to her conduct and that the evidence was not sufficient to support a verdict of guilt. After a thorough review of the record, we conclude that the statutes in question are constitutional and that the evidence is sufficient to support the verdict of guilt. Accordingly, the judgment of the trial court is affirmed.

**Tenn. R. App. P. 3 Appeal as fo Right; Judgment of the Trial Court is Affirmed.**

JERRY L. SMITH, J., delivered the opinion of the court, in which DAVID H. WELLES and ROBERT W. WEDEMEYER, JJ., joined.

Larry G. Roddy, Sale Creek, Tennessee, for the appellant, Angelee Prater.

Paul G. Summers, Attorney General & Reporter; Kathy D. Aslinger, Assistant Attorney General; J. Michael Taylor, District Attorney General; and Will Dunn, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### Factual Background

On July 20, 2000, the appellant took her son, three-and-a-half-year-old D.P., to Dayton Pediatrics in Dayton, Tennessee, where he was seen by nurse practitioner Guy Lewis. At the appointment, the appellant requested a change in the medication that was prescribed to treat D.P.'s attention deficit hyperactivity disorder ("ADHD"). She complained that D.P. was overactive despite taking Dexedrine, an amphetamine used to control the symptoms of ADHD. At that time, Mr. Lewis

prescribed .1 milligram of Clonidine for D.P. to be taken at bedtime.[1] The dosage prescribed to D.P. was the lowest dosage of Clonidine available. The drug was prescribed to help calm the effects of Dexedrine and to help D.P. sleep.

The doctor normally in charge of Dayton Pediatrics, Dr. Nelson, was on medical leave in July of 2000 so Dr. John Netterville was in charge of supervising Mr. Lewis. Dr. Netterville is a behavior pediatrician who runs the Attention and Behavior Clinic in Nashville, TN. Dr. Netterville supervised Mr. Lewis by traveling to the clinic once a week and answering any questions by telephone.

Clonidine is a drug approved by the Federal Drug Administration to control high blood pressure. Some doctors, however, prescribe Clonidine to treat ADHD in children because of the calming effect of the medication even though this use is listed as an "unlabeled" or "unapproved" use for the drug in the Physician's Desk Reference, a guide commonly utilized by doctors in determining which medication to prescribe for a patient. Two doctors, Dr. Netterville and Dr. Billy D. Arant, Chairman of the Department of Pediatrics at T.C. Thompson Children's Hospital in Chattanooga, explained that the FDA has not approved Clonidine for use in children under twelve because it is not cost effective for the drug companies to do tests on children. According to Dr. Arant, approximately eighty percent of the drugs listed in the Physician's Desk Reference are not approved for children; thus, if doctors were restricted to using drugs that had been approved, they could almost never prescribe drugs for children. Both Dr. Arant and Dr. Netterville testified that Clonidine may be prescribed for children as young as D.P. In fact, Dr. Netterville commented, "in the dose we use with the kids it's a real safe drug."

When the appellant filled the prescription for Clonidine at a local grocery store, the instructions on the package were to administer one tablet daily at bedtime. The instructions further stated:

> Follow the directions for using this medicine provided by your doctor. This medicine may be taken on an empty stomach or with food. Store this medicine at room temperature in a tightly-closed container, away from heat and light. If you miss a dose of this medicine, take it as soon as possible. If it is almost time for your next dose, skip the missed dose and go back to your regular dosing schedule. Do not take two doses at once. If you miss two or more doses in a row, contact your doctor.

The accompanying drug information listed several possible side effects of Clonidine including: "dry mouth, drowsiness, dizziness, tiredness, headache, or constipation." The warnings also included the following language, "Accidental overdose of Clonidine is an increasing cause of poisoning in children three and under. If overdose is suspected, contact your local poison control center or emergency room immediately. Symptoms of overdose may include slowed heartbeat, weakness, sleepiness, vomiting, and constricted pupils."

---

[1] Nurse practitioners can prescribe medication as long as they are supervised by a physician.

On the morning of July 25, 2000, five days after D.P. was prescribed Clonidine by Mr. Lewis, the appellant called Dayton Pediatrics to confirm the dosage of Dexadrine and Clonidine that she was supposed to administer to D.P. each day. Mr. Lewis instructed the appellant to give D.P. only one tablet of Dexedrine and one tablet of Clonidine per day. The appellant called back that afternoon around 2:00 p.m., requesting permission to increase the dose of Clonidine to two tablets because D.P. would not go to sleep. Mr. Lewis conferred with Dr. Netterville, who was at Dayton Pediatrics that day. Dr. Netterville responded, ". . . absolutely not. You give one tenth of a milligram of Clonidine once a day and that's all you use." Mr. Lewis communicated this to the appellant. The appellant called again at 4:00 p.m. and asked a nurse if she could increase the dosage of Clonidine. The nurse asked Dr. Netterville what to tell the appellant and he responded, "absolutely not. You give one pill of Clonidine and that's all you give." Dr. Netterville stood behind the nurse as she was talking to the appellant on the phone; he heard the nurse tell the appellant repeatedly that she could only give D.P. one tablet of Clonidine.

Two days later, on July 27, 2000, Stacey Raines drove her uncle Levon "Pete" Prater to pick up D.P. at a neutral location for visitation. Although Mr. Prater is not D.P.'s biological father, he is the only father figure D.P. has ever known and exercises visitation with the child every other weekend. When the two picked up D.P. at around 8:30 p.m. that evening, Ms. Raines described him as "a rag doll more or less," noting that D.P. was somewhat unresponsive and difficult to arouse.

Ms. Raines drove Mr. Prater and D.P. less than a mile to Wylene Rothwell's house. Ms. Rothwell is Ms. Raines's mother and Mr. Prater's sister. She runs a day care facility from her home. When D.P. arrived, Ms. Rothwell tried unsuccessfully to play with him for approximately fifteen to twenty minutes after his arrival. She described D.P. as "limp" and "like a little rag." He would fall over when she would try to set him up and did not respond even when immersed in a bath of cold water.

Ms. Rothwell and Mr. Prater took D.P. to the Rhea County Medical Center where a nurse took him directly to a trauma room due to the fact that he was "unresponsive," "lethargic," and "difficult to arouse." The nurse and a paramedic tried to stimulate D.P. by calling his name and rubbing his sternum with their knuckles, a technique used to elicit a response from an otherwise unresponsive patient. D.P. did not respond to their voices or to the painful stimuli. D.P. did not cry or flinch when they inserted an IV to administer two doses of Narcan, a drug designed to reverse the effects of narcotics. The paramedic described D.P.'s condition as "unconscious, unresponsive to painful stimuli" and characterized the situation as "life-threatening."

D.P. began to respond somewhat after being administered the Narcan. However, because of his condition, the attending physician decided to transport D.P. to Thompson Children's Hospital in Chattanooga by helicopter.

When D.P. arrived in Chattanooga, his situation was somewhat improved although he "was not totally aware of what was going on." D.P.'s heart rate was somewhat erratic, varying between slow and normal and he had some "pauses or irregular heart beat so he was not fully conscious." Dr.

Arant testified that D.P. had "some effects compatible with a history of ingesting a drug called Clonidine." Although D.P. could be aroused when he arrived in Chattanooga, he would go back to sleep and "would not stay awake without repeated stimulation." When asked if D.P. was in a life-threatening situation, Dr. Arant testified that "he was at risk, yes." Although he agreed that D.P.'s side effects could be from a normal dose of Clonidine, he testified that D.P. exhibited "all the symptoms and signs" of Clonidine toxicity. He testified that such an adverse reaction to the smallest doses of Clonidine would be unusual and that if such a reaction were to occur, it would occur with the first dose.

D.P. was observed in the emergency room from 1:00 a.m. to 5:00 a.m., when he was moved to a regular room. Dr. Arant explained that there was not a "real good antidote that reverses" the effect of Clonidine and that you have to basically "support the child anyway you can until the drug runs its course." D.P. was supported by intravenous fluids which helped to keep his blood pressure up and heart beat normal. The toxicology report performed in Chattanooga did not reflect Clonidine in D.P.'s system, but Dr. Netterville testified that Clonidine would not show up on the toxicology report because D.P. was not specifically tested for this drug. D.P. was discharged twelve hours after his arrival in Chattanooga with normal vital signs.

According to the medical records, the appellant reported that she gave D.P. twice his normal dosage of Clonidine every night for a week as directed by her doctor's office. Dr. Arant felt that if this were actually the case, D.P. would have exhibited the same signs on each occasion he was given a double dose. He explained that the "effects [of Clonidine] are amassed" when the drug is given at bedtime and that after sleeping for eight hours the effects of the drug would wear off. When asked what the effect would be if D.P. were given two pills per night for several nights, Dr. Arant replied:

> . . . if he got that effect with two pills on the 27th, then he got it on the 26th, and the 25th, and the 24th, and the 23rd, so he got that every night, but he was asleep and nobody was monitoring him or realized that he was at risk of dying.

Dana Morgan, an investigator with the Department of Human Services, met with the appellant at the hospital in Chattanooga on July 28, 2000. She made the following notes from her interview with the appellant, which she read at trial over objection by the appellant:

> Worker talked with . . . [the appellant] at the hospital. She states that Pete [Levon Prater] called and stated that he wanted . . . [D.P.]. She stated that she was not going to let him go. She stated later that she took a shower and he called again and wanted to get him. She stated that she asked Glenna [the appellant's friend] to take him over there to meet Pete. She stated that she then decided to call Roger . . . McFarland and see what he was doing and he had asked her out for dinner. She stated that someone by the name of Scott with 911 called her at Roger's house shortly after arriving and told her that they were airlifting . . . [D.P.] to Chattanooga. She stated that when she got to the hospital . . . [D.P] asked her to take him home. She stated that the people that airlifted him said that he was alert and fine. She said that Officer Cranfield was

-4-

there and asked Pete if he had been drinking. She stated that some nurse, she thinks her name is Dee-Dee asked her if . . . [D.P] had got some of her Valium. She said that Pete told the nurse that . . . [the appellant] was taking Valium and she got very upset when this was brought up. She stated that she told the nursing staff that she wanted Pete out of . . . [D.P's] room. She did not want . . .[D.P] in the presence of Wylene, which is Pete's sister, Sam, because she is a drunk. . . . She stated that the doctor said that . . . [D.P's] blood level look [sic] fine. She said that Roger took her to Erlanger. . . . [the appellant] reported that she was with . . . [D.P.] the entire time at Erlanger. She stated they were going to release him at 4:45 a.m., but his heart beat was erratic and they decided to admit him for observation. Worker asker her about . . . [D.P's] medicine and she said they were in a lock box at her home. She said she was advised by Guy Lewis to give him one Dexedrine pill in the morning and two Clonidine at night. Worker ask [sic] how many . . . she had left of the pills and she stated that she does not remember because she's [sic] not counted. Worker ask [sic] if she had talked to Doctor Nelson's office and she stated that she had called three or four days ago, because . . . [D.P.] was not sleeping and not wanting to go to bed. She said that she had given two Clonidine pills somewhere between five and seven p.m., Tuesday 7-27 . . . . Worker then went back to her conversation with Dr. Nelson's office and she stated that she wanted his Dexedrine increased but then decided she wanted the Clonidine increased . . . . She had stated sometimes my mind does not work so well, am I suppose to give him two Clonidine and she had called the office . . . , Doctor Nelson's office and asked about his Clonidine and then she called the office . . . and asked him to have his Clonidine increased but they refused to do that.

Despite the statement taken by the worker, the appellant later maintained to Ms. Morgan that Mr. Lewis told her to increase the Clonidine to two pills.

Ms. Morgan instructed the appellant to retrieve the remaining pills from the lock box in her home. There were fourteen Clonidine pills and eight Dexedrine pills left. According to the prescription, only eight of the thirty Clonidine pills should have been missing by July 27, 2000. Instead, there were sixteen pills missing.

The appellant was subsequently indicted by the Rhea County Grand Jury for aggravated child abuse in violation of Tennessee Code Annotated section 39-15-402. A jury trial took place on March 11 and 12, 2002, in the Rhea County Circuit Court, where the jury found the appellant guilty as charged and assessed a $25,000 fine. After a sentencing hearing on May 10, 2002, the appellant was sentenced to twenty-one and a half years. The appellant sought a new trial, based on the allegations that the child abuse statutes are unconstitutionally vague, the trial court erred in failing to dismiss the indictment as defective and the evidence at trial was insufficient to support a verdict of guilty. The trial court denied the motion for a new trial.

The appellant appeals, presenting the following issues for this court: (1) whether the child abuse statutes are unconstitutionally vague as applied; and (2) whether the evidence was sufficient to support a verdict of guilty. The state argues that the child abuse statutes are not unconstitutionally vague and the evidence was sufficient to convict the appellant of aggravated child abuse. We agree and affirm the judgment of the trial court.

## Unconstitutionally Vague Statutes

The appellant argues on appeal that Tennessee Code Annotated sections 39-15-401 and -402 are unconstitutionally vague as applied because "she could have been convicted in this case if the jury simply believed the appellant gave her son an additional dose of Clonidine regardless of which version of the facts the jury accepted [whether she administered the dosage with or without a doctor's authority]" and that the jury could have thus accepted the appellant's theory that her conduct was lawful and authorized and still convicted her of aggravated child abuse. The state counters that because the statute "requires that a defendant know his or her conduct is abusive, the statute is not unconstitutionally vague as applied" to the appellant.

The appellant has challenged the constitutionality of a statute, thus the general principles of statutory construction apply. Appellate courts are charged with upholding the constitutionality of statutes wherever possible. State v. Lyons, 802 S.W.2d 590, 592 (Tenn. 1990). In other words, we are required to indulge every presumption and resolve every doubt in favor of the constitutionality of the statute when reviewing a statute for a possible constitutional infirmity. Lyons, 802 S.W.2d at 592; see also Petition of Burson, 909 S.W.2d 786, 775 (Tenn. 1995). Generally, the language of a penal statute must be clear and concise to give adequate warning so that individuals might avoid the prohibited conduct. See State v. Boyd, 925 S.W.2d 237, 242-43 (Tenn. Crim. App. 1995). A statute is void for vagueness if it is not "sufficiently precise to put an individual on notice of prohibited activities." State v. Thomas, 635 S.W.2d 114, 116 (Tenn. 1982); see also State v. Wilkins, 655 S.W.2d 914, 915 (Tenn.1983). A criminal statute "shall be construed according to the fair import of [its] terms" when determining if it is vague. Tenn. Code Ann. § 39-11-104. "Due process requires that a statute provide 'fair warning' and prohibits holding an individual criminally liable for conduct that a person of common intelligence would not have reasonably understood to be proscribed." State v. Burkhart, 58 S.W.3d 694, 697 (Tenn. 2001) (citing Grayned v. City of Rockford, 408 U.S. 104 (1972)).

Nevertheless, the Tennessee Supreme Court has noted that "absolute precision in drafting prohibitory legislation is not required since prosecution could then easily be evaded by schemes and devices." Wilkins, 655 S.W.2d at 916; see also Burkhart, 58 S.W.3d at 697; State v. McDonald, 534 S.W.2d 650, 651 (Tenn. 1976). To determine whether a statute is unconstitutionally vague, a court should consider whether the statute's prohibitions are not clearly defined and are thus susceptible to different interpretations regarding that which the statute actually proscribes. State v. Whitehead, 43 S.W.3d 921, 928 (Tenn. Crim. App. 2000). Therefore, a statute is not unconstitutionally vague "'which by orderly processes of litigation can be rendered sufficiently definite and certain for

purposes of judicial decision.'" Wilkins, 655 S.W.2d at 91 (quoting Donathan v. McMinn County, 187 Tenn. 220, 228, 213 S.W.2d 173, 176 (1948)).

The appellant argues that the phrase "knowingly, other than by accidental means," as used in Tennessee Code Annotated section 39-15-401 is vague in that the statute is not clear to the average person and potentially allows a conviction for lawful conduct. Specifically, as applied to her situation, the appellant argues that as long as the state could prove that she administered the double dosage of Clonidine to D.P., whether she did so under the direction of a doctor or not, the state could prove that she "knowingly" and "other than by accidental means" gave D.P. medication which resulted in "serious bodily injury." Thus, she argues that she could have been convicted by the jury even if she acted lawfully.

Tennessee Code Annotated section 39-15-402 states:

(a) A person commits the offense of aggravated child abuse or aggravated child neglect who commits the offense of child abuse or neglect as defined in § 39-15-401 and:
(1) The act of abuse or neglect results in serious bodily injury to the child; or
(2) A deadly weapon is used to accomplish the act of abuse.
(b) A violation of this section is a Class B felony; provided, however, that if the abused or neglected child is six (6) years of age or less, the penalty is a Class A felony.

Child abuse or neglect is committed by:

Any person who knowingly, other than by accidental means, treats a child under eighteen (18) years of age in such a manner as to inflict injury or neglects such a child so as to adversely affect the child's health and welfare. . . .

Tenn. Code Ann. § 39-15-401.

In State v. Ducker, the Tennessee Supreme Court determined that

. . . the Tennessee child abuse and neglect statute is clear that "knowingly" modifies "treats" or "neglects." The actus reus is modified by the clause "other than by accidental means." Accordingly, the statute requires that the act of treating a child in an abusive manner or neglecting the child must be knowing conduct.

State v. Ducker, 27 S.W.3d 889, 896-97 (Tenn. 2000) (finding that mother must have knowingly left or abandoned her children in the car for more than eight hours in order to be convicted). Thus, it is the actual act of treating a child in an abusive manner that must be knowing conduct; a defendant need not know that his or her conduct will result in serious bodily injury.

The appellant herein asserts that the statute is unconstitutionally vague as applied to her because otherwise lawful conduct would satisfy the requirements of the statutes if done "knowingly." However, this court has stated that the Tennessee Supreme Court's decision in Ducker did not "dispense with the requirement that the defendant must 'know' that his treatment of the child is abusive, even if it need not be proven that he 'know' that his conduct will result in bodily injury or serious bodily injury." State v. Maze, No. M2000-02249-CCA-R3-CD, 2002 WL 1885118, at *5 (Tenn. Crim. App. at Nashville, Aug. 16, 2002). Thus, the appellant's argument that "her conduct would be no different than a mother who gave her young child an extra dose of aspirin and a severe adverse reaction occurred" fails because the act of giving the aspirin is not an abusive act- it is the act of a parent to help a child with a medical condition. In the case herein, the state was required to prove that the appellant in giving D.P. a double dose of Clonidine knowingly treated D.P. in an abusive manner, not that she merely knowingly gave him medication. We conclude that the child abuse statutes are not unconstitutionally vague as applied to the defendant because the statutes require that a defendant know his or her conduct is abusive.

## Sufficiency of the Evidence

When a defendant challenges the sufficiency of the evidence, this Court is obliged to review that claim according to certain well-settled principles. A verdict of guilty, rendered by a jury and "approved by the trial judge, accredits the testimony of the" state's witnesses and resolves all conflicts in the testimony in favor of the state. State v. Cazes, 875 S.W.2d 253, 259 (Tenn. 1994); State v. Harris, 839 S.W.2d 54, 75 (Tenn. 1992). Thus, although the accused is originally cloaked with a presumption of innocence, the jury verdict of guilty removes this presumption "and replaces it with one of guilt." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). Hence, on appeal, the burden of proof rests with the defendant to demonstrate the insufficiency of the convicting evidence. Id. The relevant question the reviewing court must answer is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. See Tenn. R. App. P. 13(e); Harris, 839 S.W.2d at 75. In making this decision, we are to accord the state "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn therefrom." See Tuggle, 639 S.W.2d at 914. As such, this Court is precluded from re-weighing or reconsidering the evidence when evaluating the convicting proof. State v. Morgan, 929 S.W.2d 380, 383 (Tenn. Crim. App. 1996); State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Moreover, we may not substitute our own "inferences for those drawn by the trier of fact from circumstantial evidence." Matthews, 805 S.W.2d at 779.

In the case herein, the appellant was charged with aggravated child abuse and the jury returned a verdict finding the appellant guilty. The appellant challenges the sufficiency of the

evidence on appeal.[2]  Specifically, the appellant argues that the evidence is insufficient to substantiate a finding of guilt because there was "no evidence that the appellant 'knowingly' treated . . . D.P. in such a manner as to 'inflict serious bodily injury' nor was there serious bodily injury." The state argues that a jury could reasonably conclude that the appellant committed the offense of aggravated child abuse.

To convict the appellant of aggravated child abuse, the state was required to prove: (1) that the appellant knowingly, other than by accidental means, treated her child, D.P., in such a manner as to inflict injury; and (2) that the act of abuse resulted in serious bodily injury.  See Tenn. Code Ann. §§ 39-15-401(a) & -402(a)(1).  Serious bodily injury includes that bodily injury which involves: "(A) A substantial risk of death; (B) Protracted unconsciousness; (C) Extreme physical pain; (D) Protracted or obvious disfigurement; or (E) Protracted loss or substantial impairment of a function of a bodily member, organ or mental faculty."  Tenn. Code Ann. § 39-11-106(34).  The state was not required, as asserted by the appellant, to prove that the appellant knew her act of abuse would result in serious bodily injury.  See Ducker, 27 S.W.3d at 897.

The proof introduced at trial established that three-and-a-half-year-old D.P. was prescribed .1 milligram of Clonidine per day to be administered at bedtime for treatment of ADHD.  The information accompanying the prescription reiterated the dosage instructions and listed warnings regarding overdose as well as possible side effects.

Five days after the prescription was written, the appellant called the doctor's office three times in one day asking about the proper dosage of the Clonidine and asking if she could increase the dosage to two .1 milligram pills.  Each time the appellant called, she was told that she was "absolutely not" to increase the dosage.

Two days later, D.P.'s father and aunt took him to the emergency room at Rhea County Medical Center because he was unresponsive and lethargic.  D.P. did not respond to voices or painful stimuli and the paramedic even opined that D.P. was in a life-threatening situation.  D.P. was airlifted to Chattanooga where a doctor explained that he exhibited "all the signs and symptoms" of Clonidine toxicity.  When asked whether D.P. was in a life threatening situation, the doctor replied that he "was at risk, yes."  Dr. Arant testified that D.P. could have been given double the dosage of Clonidine for several nights and that he would have exhibited the same symptoms each time; however, because he was asleep nobody "realized that he was at risk of dying."

When interviewed, the appellant admitted that she gave D.P. two pills of Clonidine, twice the prescribed dosage.  There were sixteen Clonidine pills missing from the prescription when only eight pills should have been used.

---

[2]Within the appellant's challenge to the sufficiency of the evidence, she asserts that the trial court gave erroneous jury instructions as to the definition of "knowingly."  Because the appellant did not challenge the jury instructions in a motion for new trial, any issue regarding jury instructions has been waived.  See Tenn. R. App. P. 3(e); see also State v. Martin, 940 S.W.2d 567, 569 (Tenn. 1997) (holding that a defendant relinquishes the right to argue on appeal any issues that should have been presented in a motion for new trial).

A rational jury could have concluded from the evidence that the appellant knowingly gave D.P. twice his dosage of Clonidine against the instructions of medical professionals and that the appellant knew her actions were abusive. The evidence supports the jury's finding of guilt. Accordingly, we affirm the judgment of the trial court.

## Conclusion

After thoroughly reviewing the record before this Court, we conclude that there is no reversible error and accordingly, the judgment of the trial court is affirmed.

_____
JERRY L. SMITH, JUDGE