IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs March 25, 2009

## STATE OF TENNESSEE v. RANDY BERNARD BRASWELL

**Appeal from the Criminal Court for Hamilton County**
**No. 241518    Jon Kerry Blackwood, Senior Judge**

**No. E2008-01392-CCA-R3-CD - Filed December 14, 2009**

A Hamilton County jury convicted the Defendant, Randy Bernard Braswell, of second degree murder and aggravated child abuse, both Class A felonies. The Defendant appeals, arguing that: (1) the evidence was insufficient to sustain his convictions; and (2) he was prejudiced by the manner in which a transcript of one of the Defendant's interviews with police—a transcript which was admitted into evidence for identification only—was redacted. After reviewing the record, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court are Affirmed.**

D. KELLY THOMAS, JR., J., delivered the opinion of the court. JAMES CURWOOD WITT, JR., J., filed a separate concurring opinion. JOSEPH M. TIPTON, P.J., concurs in both opinions.

Donna Robinson Miller (on appeal) and Leonard Michele Caputo (at trial), Chattanooga, Tennessee, for the appellant, Randy Bernard Braswell.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Senior Counsel; William H. Cox, III, District Attorney General; and Rachel Winfrey and Mary Sullivan Moore, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

At trial, Walter Harriston testified that on August 30, 2002, he lived in the same Chattanooga apartment complex where the Defendant and his girlfriend, Meka Grissom, shared an apartment. Mr. Harriston said that the Defendant, who Mr. Harriston said was wet and had his pants unbuckled, arrived at Mr. Harriston's apartment and said that Jaylen, Ms. Grissom's two-year-old son, had fallen down some steps and was not breathing. The Defendant called 911 while Mr. Harriston and his brother ran to the Defendant's residence. Once they arrived there, they saw Jaylen lying on the floor, not breathing or moving. The Defendant returned to his apartment and attempted to perform CPR on Jaylen, but the child was unresponsive; Mr. Harriston said that he believed Jaylen was dead at that point. The police and paramedics soon arrived and began working on Jaylen. Mr. Harriston testified

that the Defendant said that he was in the shower when Jaylen fell down the stairs.

Brandon Gray testified that he was one of the paramedics who responded to the 911 call at the Defendant's apartment. He said that the paramedics were told that Jaylen had fallen down the stairs, so they treated him accordingly, putting a cervical collar on the child and placing his head between two foam "CID blocks" to keep his head and neck in place. Mr. Gray said that Jaylen had no pulse and was not breathing when the paramedics arrived and that Jaylen's pupils were fixed and dilated. The paramedics placed Jaylen in an ambulance and transported him to a hospital, performing CPR and placing a breathing tube into his throat during the drive. Mr. Gray said that Jaylen showed no signs of life at any time while the paramedics worked on him. Dr. Bernard Connell, a physician at T.C. Thompson Children's Hospital in Chattanooga, testified that he was the attending physician at the Thompson emergency room when the paramedics brought Jaylen to the hospital. Dr. Connell pronounced the child dead on arrival.

Sergeant Kevin Akins with the Chattanooga Police Department testified that he assisted the lead detective in this case, Jerome Halbert, in the police investigation. Sergeant Akins said that he briefly interviewed the Defendant and other witnesses at the hospital. After Detective Halbert interviewed the Defendant separately, taking a written statement from him, the officers went to the medical examiner's office and observed Jaylen's autopsy. The next day, Sgt. Akins and Det. Halbert met the Defendant at his house. The Defendant told the officers that he was in the shower when he heard a noise and saw Jaylen at the bottom of the stairs. The officers saw a broken handrail on the stairs; the Defendant told the officers that the handrail "had been defective," and that he had complained to the apartment complex management about the handrail. The Defendant added that the rail must have broken from the wall when Jaylen held onto it going down the stairs.

Sergeant Akins testified that later, he and Det. Halbert interviewed the Defendant at the police station because "what [the Defendant] was saying, about [Jaylen] falling down the steps, wasn't consistent with the injuries that were found . . . ." At the beginning of the interview, the Defendant again told the officers that Jaylen had fallen down the steps. The officers told the Defendant that "it couldn't have happened that way due to medical evidence," which prompted the Defendant to offer a different version of events. The Defendant told the officers that "he was actually horseplaying with [Jaylen] and started talking about how he had body slammed him on the bed and flipped him and had swung him around by his hands and his feet . . . ." Sergeant Akins testified that he was not involved in the investigation after this interview.

Detective Jerome Halbert with the Chattanooga Police Department testified that he first met with the Defendant at the hospital shortly after Jaylen had been pronounced dead. The Defendant initially told Det. Halbert that Jaylen had fallen down the steps at the apartment, although unlike the Defendant's comments to Sgt. Akins and Walter Harriston, the Defendant said that he was about to enter the shower, rather than inside it, when he heard a "thud." Later that day, Det. Halbert interviewed the Defendant at the police station; this interview was recorded, and the recording of the interview was played for the jury. The substance of this interview essentially mirrored the Defendant's statement to the detective at the hospital.

After interviewing the Defendant at the police station, Det. Halbert and Sgt. Akins observed

2

the victim's autopsy. Dr. Stanton Kessler, who performed the autopsy, told the officers that the victim's injuries were not consistent with a fall. After the autopsy, Det. Halbert learned that in the course of their investigation, the police learned that the Defendant had not informed the Chattanooga Housing Authority that the railing at his apartment was broken, although the CHA's inspection records did reflect that the railing had been "loose."

The day after the victim's death, Det. Halbert and Sgt. Akins met with the Defendant at his apartment. The Defendant again told the officers that he was inside the bathroom, about to enter the shower, when he heard a noise outside. Detective Halbert said that he turned on the water inside the shower and found "that you really couldn't hardly hear anything" outside the bathroom when the shower was running. The officers and the Defendant then went back to the police station, where they interviewed the Defendant. The Defendant told police that after Jaylen's mother left the apartment to file a job application, he "started horse playing" with the child. The Defendant first grabbed one of Jaylen's arms and one of his legs, "holding him upside down" and "swinging him around" two or three times. The Defendant and Jaylen then went upstairs to a bedroom, where the Defendant "kinda did a wrestling move, body slammed him on the bed a couple of times." The Defendant acknowledged that Jaylen did not land flat on the bed; rather, "his head landed on the mattress . . . [while] the rest of his body landed on the covers." After slamming Jaylen onto the bed, the Defendant walked toward the bathroom to take a shower. The Defendant turned around and saw that Jaylen

> didn't look right to me. It looked like his face and stuff [were] getting pale and that's when I ran to him and . . . started patting his face . . . then I noticed his . . . teeth and stuff clenching so I started the CPR upstairs then I ran downstairs with him in my arms screaming for help.

The Defendant then ran outside, holding Jaylen, and asked two women to call for an ambulance. The women refused, so he brought the child back inside and "started giving him CPR again" before running to a neighbor's apartment and calling 911.

Later in the interview, the Defendant told the police that after he noticed problems with Jaylen, he asked the child to come down from the bed. When asked if Jaylen fell off the bed, the Defendant replied, "I think maybe he probably did fall off the bed," and that the child sat up on the bedroom floor before he began performing CPR. The Defendant told the officers that he first told the police that Jaylen had fallen down the stairs because he was scared. He also said, "I wouldn't dare hurt [Jaylen]. We was just horse playing."

On September 3, 2002, Det. Halbert and Sgt. Mike Mathis interviewed the Defendant a third time. During this interview, the Defendant again said that after Jaylen's mother left, he grabbed Jaylen by an arm and a leg and swung him around, but the Defendant added that he stopped when Jaylen "grazed" a speaker. The Defendant said that Jaylen did not cry after hitting the speaker so he swung the child again before bringing him upstairs. The Defendant said that he placed Jaylen on the floor before picking him up and "flipp[ing] him on[to] the bed." The Defendant said that Jaylen "landed fine," so he "flipped" Jaylen twice more. The Defendant told police that the second "flip" occurred without incident but "this last time when I flipped him I knew something was . . . real[ly]

3

wrong with him and I started getting scared." Specifically, the Defendant said that after the third slam, Jaylen "started clenching his teeth together" and "grunting and moaning." The child also turned pale and his eyes closed. The Defendant then told the police about his attempts to give the child CPR and call for help, with the substance of this portion of the interview matching his second interview with police.

Dr. Frank King, the Hamilton County medical examiner, testified regarding the results of the autopsy performed by Dr. Kessler. Dr. King said that Jaylen's cause of death "was determined to be blunt neck trauma." He testified that the autopsy revealed an

> [in]jury to the neck consist[ing] of an [in]jury to the cervical spinal cord, which are the bones in the neck, that . . . caused a stretching of that neck structure and a strain or stretch of those tissues about the level of the second cervical vertebra, which is in the neck closer to the base of the skull.

He also said that the autopsy indicated a "direct [in]jury to the spinal cord; in other words, to the nerve tissue that runs down the spinal canal." Dr. King opined that this injury was one that "you would not expect as part of normal child play or a sort of daily activities of falling down or playing or bumping into something, this is an [in]jury that requires an extreme movement of the head backwards and a stretching of the neck." He also said that this injury pattern was inconsistent with falling down stairs.

Dr. King then commented on the exact manner in which the victim's injuries would have led to his death:

> [T]he mechanism of death is [in]jury to the cervical level of the spinal cord causing swelling. And this is very close to the respiratory and cardiac centers in the brain stem. Upper cervical spinal cord and brain stem have these centers that drive our involuntary breathing and heart rate. There's an electrical connection from the brain to the brain stem to the heart and lungs that keeps us going without thinking.
>
> When you have a cervical spinal cord [in]jury that causes hemorrhage and swelling, it disrupts those pathways between the nerve cells. So this child could die very quickly after this injury or it may take a relatively short time, I'm sure, before the spinal cord [in]jury basically interferes with respiratory and cardiac drive.

Dr. King testified that the victim's injuries could have been caused by his being slammed onto the mattress, and he also said that the injuries could have been caused by the child's being swung in the air without his head and neck being supported. Dr. King said that the injury could have been caused by the child's head hitting the speaker, although he said that "I don't have a mark on the child's head that indicates an impact with a manmade object." The physician emphasized that the child's injuries resulted from "the acceleration of the body, with the head lagging behind, and then impact and then the head again lagging behind, so there is a movement in the air where the head and body are out of sync. And that's really the injury, it's not the impact . . . ."

4

Dr. King admitted that while Dr. Kessler's autopsy report indicated a neck fracture at the second cervical vertebra, any "fracture of C-2, which means the actual bone is broken, is simply not documented in a way that it can be reviewed." On cross-examination, Dr. King admitted that x-rays taken of the child's neck at the hospital emergency room showed no evidence of a C-2 fracture. The physician also admitted that he did not tell the State or the Defendant about the "acceleration/deceleration injury" findings until 2005, three years after the victim died.

The jury convicted the Defendant of second degree murder, a lesser included offense of the indicted offense of first degree felony murder. It also convicted the Defendant of aggravated child abuse as charged in the indictment. The trial court imposed concurrent sentences of twenty-two years as a Range I, standard offender for each offense. The Defendant subsequently filed a timely notice of appeal.

## ANALYSIS

### Sufficiency of Evidence

The Defendant argues that the evidence produced at trial was insufficient to sustain his convictions for second degree murder and aggravated child abuse. The Defendant also appears to contend in his brief that the State's proof was wholly circumstantial and that in order to uphold the convictions, we must conclude that the "facts and circumstances [were] so strong and cogent as to exclude every other reasonable hypothesis except that the defendant is guilty." The State argues that the evidence was sufficient for the jury to infer the elements of the crime.

As an initial matter, we will respond to the Defendant's contention that the State's proof was entirely circumstantial. After reviewing the record, we conclude that the convictions in this case were supported by both direct and circumstantial evidence. We agree that the "jury's finding of the requisite mental state was wholly circumstantial in nature;" however, the State also offered direct evidence in its case in chief. State v. Coulter, 67 S.W.3d 3, 68 (Tenn. Crim. App. 2001) (citations omitted). "When the [S]tate's proof is both direct and circumstantial, 'it is not necessary for a conviction that a defendant's innocence must be excluded from every reasonable hypothesis deducible from the circumstances.'" Id. at 69. (quoting Pearson v. State, 226 S.W. 538, 541 (1920)). "In other words, even though circumstantial evidence [wa]s needed for one element, the standard of evidence sufficiency remains the same" for our review. State v. Harold Wayne Shaw, No. 01-C01-9312-CR-00439, 1996 WL 611158, *3 (Tenn. Crim. App. Oct. 24, 1996). We acknowledge that this court has stated that when the proof of premeditation and deliberation is circumstantial in nature, "the facts and circumstances 'must be so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant.'" See State v. James Dumas, No. 02-C01-9502-CR-00031, 1995 WL 580931, *3 (Tenn. Crim. App. Oct. 4, 1995) (holding that the evidence was insufficient to support a first degree murder conviction when the State did not prove premeditation and deliberation). However, the Defendant in this case was convicted of second degree murder instead of first degree murder, and the facts in this case are more than sufficient to support a conviction for a knowing killing. Moreover, recent case law supports our proposition today. See Coulter, 67 S.W.3d at 69.

An appellate court's standard of review when a defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). The appellate court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). A guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt, and on appeal the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict. Id.; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

*Second Degree Murder*

Tennessee's criminal code defines second degree murder as a "knowing killing of another." Tenn. Code Ann. § 39-13-210 (2006). "[S]econd degree murder is strictly a 'result-of-conduct' offense." State v. Page, 81 S.W.3d 781, 787 (Tenn. Crim. App. 2002) (citing State v. Ducker, 27 S.W.3d 889, 896 (Tenn. 2000)). "The [second degree murder] statute focuses purely on the result and punishes an actor who knowingly causes another's death. The intent to engage in conduct is not an explicit element of the [S]tate's case in second degree murder." Ducker, 27 S.W.3d at 896. Our criminal code states, "A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." Tenn. Code Ann. § 39-11-106(a)(20).

In this case, the evidence established that the Defendant swung Jaylen around, possibly hitting a speaker, before slamming him onto a bed three times. The evidence also established that as a result of the Defendant's actions, Jaylen suffered a fatal injury to his spinal cord. However, to sustain a conviction for second degree murder, the State was also required to prove beyond a reasonable doubt that the Defendant was aware that his conduct was reasonably certain to cause Jaylen's death. The Defendant argues that Jaylen's death "was clearly accidental, [and] unintentional, and [that it was] most certainly unforeseeable to Defendant Braswell that playfully body slamming Jaylen on the bed would" cause the injuries that led to the child's death. The State replies, "Given the great disparity in size between the defendant and the victim, the nature of the victim's injuries, and Dr. King's testimony that it would take an 'extreme' amount of force to inflict the injury," the jury could reasonably "reject the defendant's assertion that he was horse playing with the victim and infer that the defendant intended to bring about the victim's death."

Dr. King testified that the victim's injuries required "an extreme movement of the head backwards and a stretching of the neck" and that this injury was one that "you would not expect as part of normal child play." Dr. King further testified that "a child that's 23 months old has a relatively heavy head for its body, . . . their necks are not very strong. So children are vulnerable to neck injuries with movement of their body and their head getting out of sync." The Defendant

6

told police that he did not intend to hurt Jaylen and explained that he had initially reported that the child had fallen down the stairs (a version of events which he also relayed to neighbors and first responders in the immediate aftermath of Jaylen's injuries) not because he was attempting to conceal his crimes but because he was scared. Despite the Defendant's assertions, the jury chose to discredit his testimony, as was within its province as trier of fact. Accordingly, after reviewing the record, we conclude that a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

*Aggravated Child Abuse*

The statute in effect at the time the Defendant committed these offenses defined aggravated child abuse, in pertinent part, as "child abuse" that "results in serious bodily injury to the child." Tenn. Code Ann. § 39-15-402(a)(1) (2003) (amended 2005). Child abuse was defined in pertinent part as "knowingly, other than by accidental means, treat[ing] a child . . . in such a manner as to inflict injury." Id. § 39-15-401(a). Both the former and present statutes establish aggravated child abuse of a victim six years of age or less as a Class A felony. Id. § 39-15-402(b) (2003 and 2006).

In Ducker, the Tennessee Supreme Court determined aggravated child abuse to be a nature of conduct offense. The court held that "the act of treating a child in an abusive manner or neglecting the child must be knowing conduct." Id. at 897. Interpreting Ducker, our supreme court has held that to sustain a conviction for aggravated child abuse,

> the evidence . . . must have been sufficient for a rational jury to have concluded, beyond a reasonable doubt (1) that the Defendant "was aware of the nature of the conduct," Tennessee Code Annotated § 39-11-302(b), when he treated [the victim] "in such a manner as to inflict injury," Tennessee Code Annotated 39-15-401(a); and (2) that, in so doing, he acted other than by accidental means.

State v. Hanson, 279 S.W.3d 265, 277 (Tenn. 2009). In other words, the evidence need not establish that the Defendant knew that his conduct would result in serious bodily injury. See Ducker, 27 S.W.3d at 897.

As stated above, in his brief the Defendant argues that the victim's death "was clearly accidental, unintentional, and most certainly unforeseeable." However, through Ducker and its progeny, our courts have established that to sustain an aggravated child abuse conviction, the State need only establish that the Defendant knew that his actions constituted abusive behavior—the State need not establish that the Defendant knew that his actions would cause serious bodily injury. See Ducker, 27 S.W.3d at 896-97. Thus, the Defendant's argument that he was unaware that his actions would cause the victim's injuries is irrelevant to our review of the Defendant's aggravated child abuse conviction. Rather, the central issue in our review of this issue is whether the Defendant "was aware of the nature of [his] conduct."

While the Defendant argues that he was unaware that his actions constituted abusive behavior, we are not persuaded. Two opinions are helpful in our analysis. In Ducker, the defendant

7

was convicted of aggravated child abuse after she left her two children, ages twenty-three months and twelve months, in a car with rolled-up windows between 3:45 a.m. and sometime between noon and 1:00 p.m. Id. at 891-92. The children died of "systemic hyperthermia, a condition that results when a human body severely overheats and is unable to cool itself." Id. at 892. While "the defendant testified that she did not see any danger in leaving her sons in the car for more than nine hours," id., the supreme court held that the evidence established that the defendant "knowingly and other than by accidental means neglected the children," id. at 897, thus rejecting any argument that defendant Ducker was unaware that her conduct constituted neglect.

In State v. Prater, 137 S.W.3d 25 (Tenn. Crim. App. 2003), defendant Prater's three-year-old son was prescribed 0.1 miligrams of Clonidine "to help calm the effects of [the victim's attention deficit hyperactivity disorder (ADHD) medication] and to help [the victim] sleep." Id. at 27. The instructions that came with the medication warned that "[a]ccidental overdose of Clonidine is an increasing cause of poisoning in children three and under" and provided a list of symptoms of Clonidine overdose. Id. at 28. The defendant twice called her healthcare provider and asked for permission to increase the dosage; both times, the defendant was told that she was to give her child only the prescribed dosage. Id. The child was later admitted to a hospital emergency room, exhibiting "'all the symptoms and signs' of Clonidine toxicity." Id. at 29. The defendant later admitted to a Department of Human Services (DHS) investigator that she gave the child two Clonidine pills, rather than one pill as prescribed. Id. at 30. While the defendant argued that her actions were "no different than [those of] a mother who gave her young child an extra dose of aspirin and a severe adverse reaction occurred," this court affirmed her conviction, concluding that by giving her son a double dose of Clonidine, the defendant knowingly treated the child in an abusive manner. Id. at 34-35.

Similarly, in this case we conclude that when the Defendant body slammed Jaylen onto the bed three times—shortly after hitting the child's head against a speaker—he was aware that his actions constituted abusive behavior. In other words, the evidence established that the Defendant knowingly and other than by accidental means treated Jaylen in a manner that caused injury to the child's spinal cord—injuries which ultimately led to the child's death. Just as the jury in Ducker rejected that defendant's assertion that she did not believe that leaving her small children inside a car with the windows rolled up constituted neglectful behavior, the jury in this case rejected the Defendant's assertion that he was unaware that his actions were abusive. We therefore conclude that the evidence was sufficient to sustain the Defendant's conviction for aggravated child abuse.

Redaction of Defendant's Third Interview with Police

The Defendant filed a pretrial motion in limine seeking to prohibit the State through "the use of witnesses, exhibits, arguments, or other testimony, from describing non-fatal injuries to Jaylen Grissom which occurred prior to the date listed in the indictment, to wit: August 30, 2002." The trial court granted the motion. In addition to the victim's medical records, the State also redacted several pages from the Defendant's third interview with police; in these redacted sections, Det. Halbert, Sgt. Mathis, and the Defendant discussed Jaylen's prior injuries. In the transcript of the interview, which was submitted to the jury for identification purposes only, the redacted portions of the interview are marked out with a thick, black marker. On appeal, the Defendant argues that the manner in which

the interview transcript was redacted "clearly prejudiced" him because the redaction "made the jurors aware that they were being deprived of over ten (10) pages of [his] statement."

In addition to arguing that the manner in which the transcript was redacted did not prejudice the Defendant, the State argues that the Defendant has waived the issue for failing to raise a contemporaneous objection at trial. The record reflects that at the hearing on the motion for new trial, the Defendant's trial counsel said that before the hearing on the motion in limine, he and the assistant district attorney identified which portions of the third interview were to be redacted if the trial court granted the Defendant's motion. Defense counsel admitted that after the trial court granted his motion, he "assumed [that the State's attorney] would redact it the simple way, that is just put it in the word processor and take the statements out." There is no evidence in the record to suggest that counsel suggested to the State a manner for redacting the transcript or that counsel reviewed the redacted transcript before trial. When the audio recording of the third interview was played at trial, those portions of the interview addressing the other injuries were properly omitted from the recording. However, after the recording began to play, defense counsel saw, for the first time, that the transcript of the interview had been redacted in the manner described above. Defense counsel said that although he was concerned over the jury "looking at paragraph after paragraph after paragraph of black marks," a manner of redaction he had "never seen . . . in my 18 years" of practice, he did not object to the transcript because he did not want to "call more attention to it." For its part, the trial court noted that it was unaware of the manner in which the State redacted the transcript until the motion for new trial hearing.

We agree with the State that the Defendant's failure to raise a contemporaneous objection to the manner in which the transcript was redacted waives our consideration of the issue on appeal. See Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."). Accordingly, the Defendant is limited to "plain error" review pursuant to Rule 36(b) of the Tennessee Rules of Appellate Procedure. The Defendant must establish the following five factors before this court will consider an issue for plain error:

(a) The record . . . clearly establish[es] what occurred in the trial court;
(b) a clear and unequivocal rule of law [has] been breached;
(c) a substantial right of the accused [has] been adversely affected;
(d) the accused did not waive the issue for tactical reasons; and
(e) consideration of the error is "necessary to do substantial justice."

State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)); see also State v. Gomez, 239 S.W.3d 733, 737 (Tenn. 2007). The appellate court need not consider all five factors if any single factor indicates that relief is not warranted. Smith, 24 S.W.3d at 283.

Regarding the first factor, the record clearly establishes what occurred in the trial court regarding this issue. However, we conclude that the Defendant cannot establish that he did not waive this issue for a tactical reason. Specifically, when the Defendant discovered the manner in which the State redacted the transcript, the Defendant stated that he did not object or ask the trial

9

court for a curative instruction or mistrial because he did not want to draw more attention to the transcript. Accordingly, the Defendant is not entitled to plain error review of this issue. Id.

CONCLUSION

Upon consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____

D. KELLY THOMAS, JR., JUDGE

10