IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs at Knoxville July 21, 2015

## STATE OF TENNESSEE v. ANTHONY PHILLIP JAMES, SR.

**Appeal from the Circuit Court for Montgomery County
No. 41300922     Michael R. Jones, Judge**

_____

**No. M2015-00305-CCA-R3-CD – Filed September 3, 2015**

_____

Anthony Phillip James, Sr. ("the Appellant") was convicted by a Montgomery County jury of aggravated child abuse. On appeal the Appellant alleges that the evidence presented at his trial was insufficient to prove that he knowingly injured the child. Upon review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the Court, in which CAMILLE R. MCMULLEN and ROGER A. PAGE, JJ., joined.

Roger E. Nell, District Public Defender, and Chase Smith, Assistant District Public Defender, Clarksville, Tennessee, for the Appellant, Anthony Phillip James, Sr.

Herbert H. Slatery III, Attorney General and Reporter; M. Todd Ridley, Assistant Attorney General; John W. Carney, District Attorney General; and Kimberly S. Lund, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION
## Factual and Procedural Background

The Montgomery County Grand Jury indicted the Appellant with one count of aggravated child abuse based upon injuries resulting from the Appellant's shaking his infant son.

At trial, Detective Demone Chestnut testified that he had worked for the Clarksville Police Department for approximately twelve years and currently worked as a

"crimes against children investigator." Detective Chestnut testified that he investigated the Appellant's case that and he began his investigation by responding to a report at Vanderbilt Children's Hospital. Detective Chestnut testified that he visited the victim, A.J.,[1] and photographed him.

The detective testified that he spoke with the Appellant at the hospital and recorded the interview. The State played selected portions of the recorded interview for the jury. In his interview[2] with Detective Chestnut, the Appellant admitted he handled A.J. roughly. This exchange also took place:

DETECTIVE CHESTNUT: What were you doing?

[THE APPELLANT]: Like this, shaking him up and down. I was sitting down on the couch just like this.

DETECTIVE CHESTNUT: You know you can't shake a baby right.

[THE APPELLANT]: Yes sir.
. . .
DETECTIVE CHESTNUT: Why did you shake him?

[THE APPELLANT]: To calm him down.

DETECTIVE CHESTNUT: What else?

[THE APPELLANT]: To put him back to sleep….

DETECTIVE CHESTNUT: But would it also include because you couldn't get him to stop crying?

[THE APPELLANT]: Yes.

DETECTIVE CHESTNUT: And then were you frustrated?

[THE APPELLANT]: A little, just a little.

---

[1] To protect the identity of minor victims, the court will refer to the victim by his initials.

[2] While a transcript of the recorded interview is not available, this dialogue comes directly from the recording.

DETECTIVE CHESTNUT: Ok, but you were frustrated.

[THE APPELLANT]: Yes.

DETECTIVE CHESTNUT: Ok. So he kept crying, you were frustrated, and you shook him to try to get him to stop crying?

[THE APPELLANT]: Yes sir.

Detective Chestnut also demonstrated to the jury how the Appellant said he was holding A.J. when he shook the child. Detective Chestnut stated that the Appellant held his child "[a]round the waist . . . as he placed him on his leg right underneath." The Detective also stated that he believed that the Appellant "held [A.J.] up a little bit, but more so everything took place sitting on his knee bouncing him up and down." Detective Chestnut also testified that he frequently referred to the incident between the Appellant and A.J. as an "accident" because "the term 'accident' can be used as a tool to get [a potential suspect] to understand that maybe everything may not be as bad as they may seem, but it gives them an opportunity to tell what exactly happened and how it happened."

On cross-examination, Detective Chestnut testified he told the Appellant "no one is saying that you did this on purpose" and that the Appellant was a young parent and young parents make mistakes. Detective Chestnut then stated that he did not have any medical training or training in reading MRIs. Finally, Detective Chestnut stated that he did not personally observe A.J.'s MRI bone scans.

Next, Dr. Deborah Lowen was qualified as an expert in child abuse pediatrics. She testified that when she is asked to consult on a medical case, she obtains the medical history of the patient from the referring doctor, examines the chart, and then speaks with the caregivers. Next, Dr. Lowen obtains a detailed history, examines the patient, reviews all x-rays or lab studies, performs a detailed chart review, and generates a detailed chart note.

Dr. Lowen testified that a general pediatrician saw A.J. on May 18, 2013, and Dr. Lowen examined A.J. on May 20, 2013. Dr. Lowen stated that on May 20, she reviewed the general pediatrician's notes and received an update of A.J.'s progress. Then Dr. Lowen "went and saw the baby," but both the Appellant and A.J.'s mother were unavailable to speak with Dr. Lowen at that time. Dr. Lowen also reviewed A.J.'s x-rays and lab studies and spoke with Detective Chestnut. Dr. Lowen stated that the history she received on A.J. showed that he had been a healthy baby except for some minor health

concerns before the incident. Dr. Lowen stated that when she examined A.J., he had "decompensated" and "needed to be put on a ventilator." Dr. Lowen also stated that A.J. "had had difficulty with lots and lots of seizures" and "was on multiple medications . . . so he was not very responsive." Dr. Lowen also noted that A.J. had multiple bruises that had been documented upon arrival at the hospital and were still visible on May 20.

Next, Dr. Lowen testified that she examined A.J.'s x-rays and lab work, which showed A.J. had a subdural hematoma, a brain bruise, and injury to the ligaments at the back of his neck. Dr. Lowen explained that the injuries to A.J.'s head were "very significant" and caused not only bruising but "diffuse wide spread damage to the brain." Dr. Lowen also testified that A.J. had "bruising on the right side of his jaw line" and on both shoulders and sides of his torso when he was admitted to the hospital.

Dr. Lowen testified that an ophthalmologist later evaluated A.J. and determined he had retinal hemorrhages in the back of both eyes. Additionally, Dr. Lowen stated she later learned A.J. had "at least four rib fractures," which were not visible when A.J. was first admitted to the hospital because "[r]ib fractures are really difficult to detect when they are brand new."

Dr. Lowen confirmed that she had diagnosed A.J. with non-accidental abusive head trauma and rib fractures based on A.J.'s medical conditions, injuries, and "the lack of any history of accidental trauma . . . ." Dr. Lowen stated that abusive head trauma can often occur from brain rotation, which occurs when "the brain is moving rapidly through the skull, within the skull and it moves at a different rate than the skull." Dr. Lowen testified that "a violent type of shaking"—more violent that someone bouncing a baby on one's knees—or "squeezing" would have been consistent with the types of injuries A.J. sustained. She stated that the injuries to A.J.'s neck ligaments could have been caused by A.J.'s head "going back and forth in a very rapid aggressive manner." Dr. Lowen testified that she had last examined A.J. in January 2014 and that A.J. was "definitely delayed" and had cerebral palsy.

Next, the Appellant took the stand and testified about the incident involving himself and his son. The Appellant stated that on May 17, 2013, he came home around 3:30 p.m. and sat down on the couch to watch television with A.J. lying on the couch in between himself and his wife, Alesha James. The Appellant stated that when A.J. woke up and began crying, Mrs. James got a bottle and the Appellant fed him. A.J. continued crying, so the Appellant burped A.J. and placed A.J. on his knee "with [his] hands on [A.J.'s] flank area with lack of head support, bouncing [A.J.] on [his] knee to calm [A.J.] down." The Appellant continued to "bounce" A.J. for at least five minutes before A.J. fell asleep.

- 4 -

Approximately two or three hours later, after Mrs. James had left for work, A.J. woke up and continued crying. The Appellant changed A.J.'s diaper and gave him another bottle. The Appellant testified that he then changed A.J.'s diaper for a second time but, "after [the Appellant] changed his diaper the second time, [A.J.] just completely gasped and just flopped out, just flopped with no response at all." After A.J. became unresponsive, the Appellant called 9-1-1, and A.J. was taken to Blanchfield Hospital. At some point during the evening of May 17, the nurse taking care of A.J. "noticed he wasn't responding to the movement of her finger," so A.J. was transferred to Vanderbilt Children's Hospital. The Appellant admitted that it was wrong for him to not support A.J.'s head when he bounced A.J. on his knee. The Appellant also admitted that his actions with A.J. were reckless and negligent and resulted in A.J.'s injuries. The Appellant testified that he regretted "every last bit of it" and had "no intentions o[f] hurting [his] child."

On cross-examination, the Appellant admitted that he told Detective Chestnut that he shook and squeezed A.J. "around the flank area," which left bruises on A.J.'s side, flanks, and shoulder area. The Appellant also admitted that A.J.'s crying frustrated him and that A.J. had been crying for days before the incident due to constipation. The Appellant stated that he intended to bounce A.J. on his knee "to calm him down." On redirect, the Appellant clarified that he had been truthful in his statements to Detective Chestnut and truthful in his testimony in court. After closing arguments and deliberation, the jury found the Appellant guilty of aggravated child abuse. This timely appeal followed.

## Analysis

On appeal, the Appellant challenges the sufficiency of the evidence supporting his conviction. Our standard of review for a sufficiency of the evidence challenge is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in original); see also Tenn. R. App. P. 13(e). Questions of fact, the credibility of witnesses, and weight and value to be given the evidence are resolved by the fact finder. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978), superseded on other grounds by Tenn. R. Crim. P. 33 as stated in State v. Moats, 906 S.W.2d 431, 434 n.1 (Tenn. 1995). This court will not reweigh the evidence. Id. Our standard of review "is the same whether the conviction is based upon direct or circumstantial evidence." State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)) (internal quotation marks omitted).

A guilty verdict removes the presumption of innocence, replacing it with a presumption of guilt. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The defendant bears the burden of proving why the evidence was insufficient to support the conviction. Bland, 958 S.W.2d at 659; Tuggle, 639 S.W.2d at 914. On appeal, the "State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." State v. Vasques, 221 S.W.3d 514, 521 (Tenn. 2007).

As charged in the indictment, "[a]ny person who knowingly, other than by accidental means, treats a child under eighteen (18) years of age in such a manner as to inflict injury" commits child abuse. Tenn. Code Ann. § 39-15-401 (a) (Supp. 2013). A person commits aggravated child abuse when they commit child abuse and "[t]he act of abuse . . . results in serious bodily injury to the child." Tenn. Code Ann. § 39-15-402(a)(1) (Supp. 2013). Aggravated child abuse is a Class A felony if the abused child is eight years of age or less. Tenn. Code Ann. § 39-15-402(b) (Supp. 2013). The Appellant conceded that A.J. sustained serious bodily injury, that his actions caused A.J.'s injury, and that A.J. was under the age of eight. The Appellant only argues that he "did not knowingly treat A[.]J[.] in such a manner as to inflict injury."

"'Knowing' refers to a person who acts knowingly with respect to the conduct or to the circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." Tenn. Code Ann. § 39-11-302(b) (2010).

In Tennessee, child abuse is classified as a nature-of-conduct offense. Dorantes, 331 S.W.3d at 386 (citing Hanson, 279 S.W.3d at 276-77) "As a nature-of-conduct offense, the evidence must be sufficient for a rational jury to have concluded, beyond a reasonable doubt, that the defendant was aware of the nature of his conduct when he treated the victim in such a manner as to inflict injury, and that, in doing so, he acted other than by accidental means." Id. (citing Hanson, 279 S.W. 3d at 277). "[T]he Tennessee child abuse and neglect statute is clear that 'knowingly' modifies 'treats' or 'neglects." Ducker, 27 S.W.3d at 897. "[I]t is the actual act of treating a child in an abusive manner that must be knowing conduct; a defendant need not know that his or her conduct will result in serious bodily injury." State v. Prater, 137 S.W.3d 25, 33 (Tenn. Crim. App. 2003).

On appeal, the Appellant asserts that he "did not act knowingly with respect to the conduct or to circumstances surrounding the conduct. He did not know he was inflicting injury upon his child." However, the State notes that "[w]hen speaking with Detective

Chestnut, [the Appellant] acknowledged that he was frustrated with [A.J.] and explicitly admitted that he shook the 27-day old infant." Additionally, the State argues that the testimony of Dr. Lowen supports an inference that the Appellant injured A.J. by "'a violent type of shaking . . . [n]ot like a bouncing on the knee like people do with little babies, but something well beyond that.'" We agree with the State.

According to the medical evidence, A.J. suffered "very significant" head trauma, retinal hemorrhages in both eyes, and "at least four rib fractures." Dr. Lowen's testimony established that these injuries resulted from someone violently shaking or "squeezing" the infant. The Appellant admitted numerous times in his interview with Detective Chestnut and on direct and cross-examination that he either shook or bounced A.J. and squeezed A.J. on his flanks or sides. The Appellant knew he was bouncing or shaking A.J. and was aware of the nature of the bouncing or shaking because the Appellant wanted to calm A.J. down. The Appellant also admitted to Detective Chestnut that he was frustrated by A.J.'s crying and shook him to get him to stop crying. To have the requisite mental state to commit child abuse, the Appellant did not have to intend to hurt A.J., nor did the Appellant need to realize the injurious effects of his actions when he was bouncing or shaking A.J. The Appellant chose to bounce or shake A.J. so that A.J. would stop crying and fall back asleep. There is sufficient evidence in the record that could have led a rational juror to conclude beyond a reasonable doubt that the Appellant was aware of the nature of his conduct of shaking, bouncing, and squeezing A.J. and that the Appellant did not act by "accidental means." Therefore, the evidence was sufficient to support the jury's verdict.

## Conclusion

For the aforementioned reasons, the judgment of the trial court is affirmed.

_____
ROBERT L. HOLLOWAY, JR., JUDGE