IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs October 24, 2012

**RANDY B. BRASWELL, JR. v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Hamilton County**
No. 279893    Jon Kerry Blackwood, Judge

**No. E2012-00347-CCA-R3-PC - Filed January 22, 2013**

The Petitioner, Randy B. Braswell, Jr., appeals the Hamilton County Criminal Court's denial of post-conviction relief from his 2006 convictions for second degree murder and aggravated child abuse and his effective twenty-two-year sentence. On appeal, he contends that the trial court erred by finding counsel provided the effective assistance of counsel. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOSEPH M. TIPTON, P.J., delivered the opinion of the court, in which THOMAS T. WOODALL and D. KELLY THOMAS, JR., JJ., joined.

Charles P. Dupree, Chattanooga, Tennessee, for the appellant, Randy B. Braswell, Jr.

Robert E. Cooper, Jr., Attorney General and Reporter; Rene W. Turner, Senior Counsel; William H. Cox, III, District Attorney General; and Cameron Williams, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

This court summarized the facts of the case in the Petitioner's appeal of his convictions:

> Walter Harriston testified that . . . he lived in the same Chattanooga apartment complex where the Defendant and his girlfriend, Meka Grissom, shared an apartment. Mr. Harriston said that the Defendant, who Mr. Harriston said was wet and

had his pants unbuckled, arrived at Mr. Harriston's apartment and said that Jaylen, Ms. Grissom's two-year-old son, had fallen down some steps and was not breathing. The Defendant called 911 while Mr. Harriston and his brother ran to the Defendant's residence. Once they arrived there, they saw Jaylen lying on the floor, not breathing or moving. The Defendant returned to his apartment and attempted to perform CPR on Jaylen, but the child was unresponsive; Mr. Harriston said that he believed Jaylen was dead at that point. The police and paramedics soon arrived and began working on Jaylen. Mr. Harriston testified that the Defendant said that he was in the shower when Jaylen fell down the stairs.

Brandon Gray testified that he was one of the paramedics who responded to the 911 call. . . . He said that the paramedics were told that Jaylen had fallen down the stairs, so they treated him accordingly, putting a cervical collar on the child and placing his head between two foam "CID blocks" to keep his head and neck in place. Mr. Gray said that Jaylen had no pulse and was not breathing when the paramedics arrived and that Jaylen's pupils were fixed and dilated. . . . Mr. Gray said that Jaylen showed no signs of life at any time. . . . Dr. Bernard Connell . . . testified that he was the attending physician at the . . . emergency room when the paramedics brought Jaylen to the hospital. Dr. Connell pronounced the child dead on arrival.

Sergeant Kevin Akins with the Chattanooga Police Department testified that he . . . briefly interviewed the Defendant and other witnesses at the hospital. After Detective Halbert interviewed the Defendant separately, taking a written statement from him, the officers went to the medical examiner's office and observed Jaylen's autopsy. . . . The Defendant told the officers that he was in the shower when he heard a noise and saw Jaylen at the bottom of the stairs. The officers saw a broken handrail on the stairs; the Defendant told the officers that the handrail "had been defective," and that he had complained to the apartment complex management about the handrail. The Defendant added that the rail must have broken from the wall when Jaylen held onto it going down the stairs. Sergeant Akins testified that later, he and Det. Halbert interviewed the

Defendant at the police station because "what [the Defendant] was saying, about [Jaylen] falling down the steps, wasn't consistent with the injuries that were found . . . ." At the beginning of the interview, the Defendant again told the officers that Jaylen had fallen down the steps. The officers told the Defendant that "it couldn't have happened that way due to medical evidence," which prompted the Defendant to offer a different version of events. The Defendant told the officers that "he was actually horseplaying with [Jaylen] and started talking about how he had body slammed him on the bed and flipped him and had swung him around by his hands and his feet . . . ."

Detective Jerome Halbert with the Chattanooga Police Department testified that . . . [t]he Defendant initially told Det. Halbert that Jaylen had fallen down the steps at the apartment, although unlike the Defendant's comments to Sgt. Akins and Walter Harriston, the Defendant said that he was about to enter the shower, rather than inside it, when he heard a "thud." Later that day, Det. Halbert interviewed the Defendant at the police station; this interview was recorded, and the recording of the interview was played for the jury. The substance of this interview essentially mirrored the Defendant's statement to the detective at the hospital.

After interviewing the Defendant at the police station, Det. Halbert and Sgt. Akins observed the victim's autopsy. Dr. Stanton Kessler, who performed the autopsy, told the officers that the victim's injuries were not consistent with a fall. After the autopsy, Det. Halbert learned that . . . the Defendant had not informed the Chattanooga Housing Authority that the railing at his apartment was broken, although the CHA's inspection records did reflect that the railing had been "loose."

The day after the victim's death, Det. Halbert and Sgt. Akins met with the Defendant at his apartment. The Defendant again told the officers that he was inside the bathroom, about to enter the shower, when he heard a noise outside. Detective Halbert said that he turned on the water inside the shower and found "that you really couldn't hardly hear anything" outside the bathroom when the shower was running. The officers and the

Defendant then went back to the police station, where . . . [t]he Defendant told police that after Jaylen's mother left the apartment to file a job application, he "started horse playing" with the child. The Defendant first grabbed one of Jaylen's arms and one of his legs, "holding him upside down" and "swinging him around" two or three times. The Defendant and Jaylen then went upstairs to a bedroom, where the Defendant "kinda did a wrestling move, body slammed him on the bed a couple of times." The Defendant acknowledged that Jaylen did not land flat on the bed; rather, "his head landed on the mattress . . . [while] the rest of his body landed on the covers." After slamming Jaylen onto the bed, the Defendant walked toward the bathroom to take a shower. The Defendant turned around and saw that Jaylen

> didn't look right to me. It looked like his face and stuff [were] getting pale and that's when I ran to him and . . . started patting his face . . . then I noticed his . . . teeth and stuff clenching so I started the CPR upstairs then I ran downstairs with him in my arms screaming for help.

The Defendant then ran outside, holding Jaylen, and asked two women to call for an ambulance. The women refused, so he brought the child back inside and "started giving him CPR again" before running to a neighbor's apartment and calling 911.

Later in the interview, the Defendant told the police that after he noticed problems with Jaylen, he asked the child to come down from the bed. When asked if Jaylen fell off the bed, the Defendant replied, "I think maybe he probably did fall off the bed," and that the child sat up on the bedroom floor before he began performing CPR. The Defendant told the officers that . . . Jaylen had fallen down the stairs because he was scared. He also said, "I wouldn't dare hurt [Jaylen]. We was just horse playing."

On September 3, 2002, Det. Halbert and Sgt. Mike Mathis interviewed the Defendant a third time. [T]he Defendant

-4-

again said that after Jaylen's mother left, he grabbed Jaylen by an arm and a leg and swung him around, but the Defendant added that he stopped when Jaylen "grazed" a speaker. The Defendant said that Jaylen did not cry after hitting the speaker so he swung the child again before bringing him upstairs. The Defendant said that he placed Jaylen on the floor before picking him up and "flipp[ing] him on[to] the bed." The Defendant said that Jaylen "landed fine," so he "flipped" Jaylen twice more. The Defendant told police that the second "flip" occurred without incident but "this last time when I flipped him I knew something was . . . real[ly] wrong with him and I started getting scared." Specifically, the Defendant said that after the third slam, Jaylen "started clenching his teeth together" and "grunting and moaning." The child also turned pale and his eyes closed. . . .

Dr. Frank King, the Hamilton County medical examiner, testified . . . that Jaylen's cause of death "was determined to be blunt neck trauma." He testified that the autopsy revealed an [in]jury to the neck consist[ing] of an [in]jury to the cervical spinal cord. . . . He also said that the autopsy indicated a "direct [in]jury to the spinal cord; in other words, to the nerve tissue that runs down the spinal canal." Dr. King opined that this injury was one that "you would not expect as part of normal child play or a sort of daily activities of falling down or playing or bumping into something, this is an [in]jury that requires an extreme movement of the head backwards and a stretching of the neck." He also said that this injury pattern was inconsistent with falling down stairs.

Dr. King then commented on the exact manner in which the victim's injuries would have led to his death:

> [T]he mechanism of death is [in]jury to the cervical level of the spinal cord causing swelling. And this is very close to the respiratory and cardiac centers in the brain stem. Upper cervical spinal cord and brain stem have these centers that drive our involuntary breathing and heart rate. There's an electrical connection from the brain to

the brain stem to the heart and lungs that keeps us going without thinking.

When you have a cervical spinal cord [in]jury that causes hemorrhage and swelling, it disrupts those pathways between the nerve cells. So this child could die very quickly after this injury or it may take a relatively short time, I'm sure, before the spinal cord [in]jury basically interferes with respiratory and cardiac drive.

Dr. King testified that the victim's injuries could have been caused by his being slammed onto the mattress, and he also said that the injuries could have been caused by the child's being swung in the air without his head and neck being supported. Dr. King said that the injury could have been caused by the child's head hitting the speaker, although he said that "I don't have a mark on the child's head that indicates an impact with a manmade object." The physician emphasized that the child's injuries resulted from "the acceleration of the body, with the head lagging behind, and then impact and then the head again lagging behind, so there is a movement in the air where the head and body are out of sync. And that's really the injury, it's not the impact . . . ."

Dr. King admitted that while [the] autopsy report indicated a neck fracture at the second cervical vertebra, any "fracture of C-2, which means the actual bone is broken, is simply not documented in a way that it can be reviewed." On cross-examination, Dr. King admitted that x-rays taken of the child's neck at the hospital emergency room showed no evidence of a C-2 fracture. The physician also admitted that he did not tell the State or the Defendant about the "acceleration/deceleration injury" findings until 2005, three years after the victim died.

State v. Randy Bernard Braswell, E2008-01392-CCA-R3-CD, slip op. at 1-5 (Tenn. Crim. App. Dec. 14, 2009), perm. app. denied (Tenn. May 12, 2010). The Petitioner was convicted of second degree murder and aggravated child abuse and sentenced to concurrent sentences of twenty-two years.

At the post-conviction hearing, counsel testified that he received his license to practice law in 1970 and that he represented the Petitioner. He said that he and the prosecutor reached a plea agreement but that the prosecutor spoke to someone from the district attorney's office minutes before the plea hearing was scheduled to begin and that the prosecutor told him, "You're not going to believe this, I've been overruled." He said that he did not have any difficulty with the prosecutor until the plea agreement collapsed and that the prosecutor was "very agitated" and angry during the trial. He said the prosecutor's anger was directed at counsel's office, not him personally, although he did not state the reasons for her anger.

Counsel testified that after the plea agreement was withdrawn, he met with the prosecutor to discuss the Petitioner's multiple statements to the police. He said that they reached an agreement regarding the portions to be redacted and that the prosecutor said, "We'll take care of it." He said, though, they did not have a formal, written agreement. He said he took the prosecutor's statement to mean that at the trial, there would be one set of the Defendant's statements without any redactions and another set excluding the relevant statements. He thought the prosecutor would "cut and paste" and delete the redacted portions in their entirety, although he agreed he was never told how the prosecutor would prepare the statements. He said that although the transcripts of the statements were introduced for identification purposes only, the recording of the statements was admitted into evidence. He said the recording sounded "perfect" because it did not sound like any material had been redacted.

Counsel testified that he saw the transcript of the Petitioner's statements when it was distributed to the jury and that instead of "cutting and pasting," the prosecutor had "black-mark-through" the transcript, which totaled ten pages. He said that he considered whether to object to the black-lined redactions and that he decided objecting would "call attention to it." He thought the trial court had a copy of the transcript but said he was unsure. The trial court stated that it did not know about the redaction method until counsel raised the issue in the motion for a new trial.

Counsel testified that after the recording of the Petitioner's statements was played, he did not ask the trial court for a limiting instruction or a mistrial. He said that he understood various offices redacted material differently and that

> when this happened, my intention was to ask for a mistrial after the witness got off the stand and after the tape was played. By the time we got through with that, I didn't do that, I didn't think about it anymore, it wasn't really a conscious decision, I just didn't do it.

He thought the trial court instructed the jury that the recording was the evidence rather than the transcript but said he learned from reviewing the transcript of the trial testimony that no such instruction was given to the jury. He said, though, that he did not want to draw any more attention to the redactions.

Counsel testified that he attempted to show with the Petitioner's statements and the witnesses' testimony that the Petitioner requested someone call 9-1-1 and attempted to revive the victim. He concluded that he did not want to ask for a mistrial because of the "Kessler/King issue" and because although Dr. Kessler was a favorable witness for the State, Dr. King was a favorable defense witness who concluded that there was no evidence the victim suffered a broken neck. He explained that Dr. Kessler and Dr. King were medical examiners who did not like each other personally or professionally and that Dr. Kessler had been asked to leave the Medical Examiner's Office. He said that he interviewed Dr. King four times before the trial.

Counsel testified that the prosecutor attempted to introduce medical records that had been excluded by the trial court, that the records were redacted, and that the prosecutor said, "Whoops, I may have missed a couple of things," when she realized some material had not been redacted. Counsel said that he objected to admitting the material that was ordered redacted. Although he denied there was an "ongoing battle" with the prosecutor regarding the victim's prior injuries, he said he "had to be on his toes" because the prosecutor continuously tried to present evidence of a broken neck without testimony from the medical examiner who performed the autopsy. He said the prosecutor was agitated at the court for granting his pretrial motion. He recalled the prosecutor's attempting to present evidence of the victim's prior injuries through witness testimony after the court had excluded the evidence. He said he did not object because of Dr. King's favorable testimony with regard to the neck injury, although he raised a prosecutorial misconduct issue in the motion for a new trial.

Counsel testified that although he could not recall how he phrased his argument that the offenses should have been merged during the sentencing hearing, he said the offenses contained different elements. He recalled the trial court's ordering concurrent sentences. He recalled discussing with the Petitioner his unfamiliarity with the trial judge's sentencing preferences and counsel's hope of concurrent sentences because the offenses occurred at the same time.

On cross-examination, counsel testified that he was a prosecutor for more than ten years and that he had tried between 200 and 250 criminal cases. He agreed he filed pretrial motions to reduce the Petitioner's bond twice and to exclude autopsy photographs. He said that the trial court granted the motion to exclude and that he filed the motion because he did

not want the Petitioner to suffer prejudice from photographs of a young child's autopsy. He agreed the court granted his motion to exclude evidence of the victim's prior injuries. He said the injury to the victim's spine was the only injury the State was allowed to discuss.

Counsel testified that the plea agreement was reached between one to two months before the trial. Although he could not recall the details of the plea agreement, he thought it was for eight or twelve years. He said he prepared for the trial during the plea negotiations by interviewing Dr. King and Detective Atkins and visiting the scene. He could not recall interviewing any additional State witnesses.

Counsel testified that he did not notice any variances between the recording of the Petitioner's statement and the transcript. He agreed he made a tactical decision not to object to the redaction method. He said that he told the Petitioner during the trial that the statement was redacted with a black marker but that he did not discuss with the Petitioner whether he was going to object. On redirect examination, counsel stated that he did not examine the transcript before it was distributed to the jurors and that he assumed the prosecutor redacted the transcript the way they discussed.

Appellate counsel testified that she had practiced law for twenty-five years, that she worked for the public defender's office for nineteen years, and that she did mostly appellate work for twelve of those years. She said the Petitioner's appeal was the first appointed case she received after leaving the public defender's office. She said she met with the Petitioner several times in preparing his appeal. She said that the Petitioner prepared a list of issues he wanted raised on the appeal and that she believed those issues were appropriate for post-conviction relief. She said she did not recall any discussions with the Petitioner or counsel about the constitutionality of the aggravated child abuse statute. She agreed she did not raise the issue on appeal. She stated that even if she had successfully raised and argued the issue, the Petitioner would not have benefitted from it because he was also convicted of second degree murder and received a concurrent sentence. She said that she read the concurring opinion from this court stating that the aggravated child abuse statute was "a mess" and "provided no guidance."

Appellate counsel testified that although she could not recall the details, she and the Petitioner discussed counsel's failure to request a jury instruction on the evidentiary value of the recording and the transcript of the Defendant's statement. She said the method of redaction was a focal point of the appeal. She said she did not raise the issue of merging the Petitioner's convictions on appeal because she feared the State's desire to have consecutive sentencing imposed. She recalled cases where the State raised the issue of the trial court's ordering concurrent sentencing and the appellate court's changing a sentence to a defendant's detriment. She said that the State did not file a notice of appeal but that the State could have

raised the sentencing issue in their appellate brief. She did not recall discussing this possibility with the Petitioner.

Appellate counsel testified that she thought the most appropriate issues for appeal were sufficiency of the evidence and the redacted transcript. She said that during her investigation, she talked to Detective Atkins and the prosecutor, who expressed concern of whether the Petitioner intentionally caused the victim's injuries. She said that the Petitioner's tearing down the staircase railing and his untruthful statements to the police led to his convictions and that the police thought the Petitioner would not have been convicted had he been truthful in the beginning. She agreed the Petitioner's intent was a jury question. She agreed that the jury's perception of the Petitioner was critical to the outcome of the trial and that the redaction in the transcript "made a serious contribution to his conviction." She said that she argued on appeal that the redaction method was plain error and that she did not phrase the issue as prosecutorial misconduct because counsel did not phrase the issue as prosecutorial misconduct in the motion for a new trial.

On cross-examination, appellate counsel testified that she could only speculate about the effect the redacted transcript had on the jury's verdict and that she did not speak with any of the jurors. On redirect examination, she stated that she vaguely remembered the Petitioner's talking about the issue of using the same evidence for both offenses and that she did not raise the issue because she concluded the issue was without merit. She said that she and the Petitioner ultimately agreed upon which issues to raise in the appeal. She said that if the Petitioner disagreed with her, his only course of action was to raise it in a petition for post-conviction relief.

The trial court denied post-conviction relief. With regard to the redaction method used by the prosecutor, the trial court found that the Petitioner's pretrial motion to exclude references to the victim's previous injuries was granted and that the State was required to redact references to those injuries in the recording of the Petitioner's statement to the police. The court stated that the transcript of the recording was not redacted by cutting and pasting but by using a "dark black line through the portions that were to be redacted" and found that trial counsel did not know the prosecutor chose this redaction method until it was distributed to the jury. The court found that counsel did not object to the redaction method or request a mistrial because the recording of the Petitioner's statement was properly redacted and already playing for the jury. The court stated that the issue was raised on appeal and that the appellate court concluded that the lack of an objection waived the issue and that plain error did not require reversal.

The trial court found that trial counsel was not deficient by failing to object to the redaction method and that the decision not to object was a tactical decision. The court stated that the prosecutor "came close to being held in contempt a couple of times. And I don't believe that I was aware about the blackened redaction, or at least I can't recall that I was aware of [it] except later." The court found that an objection to the redaction method might have called more attention to the statement, created speculation among the jurors, and harmed the Petitioner more than allowing the recording to play. The court concluded that counsel made "a smart tactical move" because an objection might have caused more damage.

With regard to merger, the trial court found that trial counsel did not request the Petitioner's convictions be merged because he feared consecutive sentencing might be imposed and that the issue was without merit. With regard to the prosecutor's attempting to present evidence of the victim's prior injuries after such evidence was excluded, the court found that counsel made the appropriate objections. With regard to the second degree murder and aggravated child abuse convictions being inconsistent, the court concluded that counsel and appellate counsel were not deficient by failing to raise the issue in the motion for a new trial and on appeal.

With regard to the constitutionality of the aggravated child abuse statute, the trial court found that appellate counsel did not raise the issue on appeal. It relied on State v. Prater, 137 S.W.3d 25, 31 (Tenn. Crim. App. 2003), to conclude that the issue would not have been meritorious on appeal. This appeal followed.

The burden in a post-conviction proceeding is on the petitioner to prove his grounds for relief by clear and convincing evidence. T.C.A. § 40-30-110(f) (2012). On appeal, we are bound by the trial court's findings of fact unless we conclude that the evidence in the record preponderates against those findings. Fields v. State, 40 S.W.3d 450, 456-57 (Tenn. 2001). Because they relate to mixed questions of law and fact, we review the trial court's conclusions as to whether counsel's performance was deficient and whether that deficiency was prejudicial under a de novo standard with no presumption of correctness. Id. at 457. Post-conviction relief may only be given if a conviction or sentence is void or voidable because of a violation of a constitutional right. T.C.A. § 40-30-103 (2012).

Under the Sixth Amendment, when a claim of ineffective assistance of counsel is made, the burden is on the Petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial. Strickland v. Washington, 466 U.S. 668, 687 (1984); see Lockhart v. Fretwell, 506 U.S. 364, 368-72 (1993). In other words, a showing that counsel's performance fell below a reasonable standard is not enough because the Petitioner must also show that but for the substandard performance, there is "a reasonable probability that . . . the result of the proceeding would have been different." Strickland, 466

U.S. at 694. The Strickland standard has been applied to the right to counsel under article I, section 9 of the Tennessee Constitution. State v. Melson, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

A petitioner will only prevail on a claim of ineffective assistance of counsel after satisfying both prongs of the Strickland test. Henley v. State, 960 S.W.2d 572, 580 (Tenn. 1997). The performance prong requires a petitioner raising a claim of ineffectiveness to show that counsel's representation fell below an objective standard of reasonableness or "outside the wide range of professionally competent assistance." Strickland, 466 U.S. at 690. The prejudice prong requires a petitioner to demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. A reasonable probability means a "probability sufficient to undermine confidence in the outcome." Id.

The Petitioner contends that the trial court erred by denying him post-conviction relief. He argues that counsel was deficient by failing to examine the redacted transcript of his statement to the police before it was provided to the jury, by failing to object to the prosecutor's redaction method, and by failing to request a jury instruction addressing the evidentiary value of the recording and the transcript. The State responds that the trial court properly denied post-conviction relief. We agree with the State.

The record shows that the trial court credited counsel's testimony. Counsel testified that after he met with the prosecutor about the redacted statements, the prosecutor said, "We'll take care of it." Counsel believed the prosecutor would "cut and paste" the redacted portions of the Petitioner's statement, deleting them in their entirety. Although counsel did not review the transcript before the trial, he said the recording was "perfect" because it did not sound like any material had been redacted. Likewise, although the transcript was introduced for identification, the recording of the Petitioner's statement was admitted into evidence.

With regard to counsel's failure to object to the redaction method and to request a jury instruction, counsel made a tactical decision not to object to the redaction because he did not want to bring further attention to it. The trial court concluded that not objecting to the redaction was "a smart tactical move" because an objection might have created speculation among the jurors and harmed the Petitioner's case. With regard to counsel's failure to request a jury instruction about the evidentiary value of the recording and the transcript, counsel testified that he did not want to bring attention to the transcript by requesting an instruction. We conclude that the record does not preponderate against the trial court's findings.

The Petitioner also argues that counsel were deficient by failing to raise the constitutionality of the aggravated child abuse statute as an issue at the hearing on the motion for a new trial and on appeal. In his brief, he argues the statute is vague "in its definition and prohibited behavior." The State does not address this argument. With regard to counsel, there was no evidence presented at the evidentiary hearing regarding his failure to raise the constitutionality of the aggravated child abuse statute during the hearing on the motion for a new trial. With regard to appellate counsel, she admitted that she did not raise the issue on appeal and said she did not recall discussing the issue with counsel or the Petitioner. We cannot conclude, though, that appellate counsel was deficient by failing to raise the issue on appeal.

In relying on State v. Prater, 137 S.W.3d 25 (Tenn. Crim. App. 2003), and State v. Ducker, 27 S.W.3d 889 (Tenn. 2000), this court concluded in the Petitioner's appeal of his conviction that the "central issue" was whether the Petitioner was aware that his conduct constituted abusive behavior, not whether the Petitioner knew his conduct would result in serious bodily injury. Randy Bernard Braswell, slip op. at 7-8. This court concluded that the Petitioner was aware that his slamming the victim onto a bed three times after the victim's head struck a speaker was abusive behavior. Id., slip op. at 8. Although the concurring opinion noted concern that Prater and Ducker "[did] not invite helpful application of the child abuse statute by allowing the 'knowing' scienter to 'treating a child in an abusive manner,'" there is no indication that a constitutional challenge to the aggravated child abuse statute would have been successful. Id., slip op. at 11 (Witt, J., concurring) (Tipton, P.J., concurring in both opinions).

Lastly, the Petitioner argues that counsel were deficient by failing to request his convictions be merged during the hearing on the motion for a new trial and on appeal. The State responds that counsel were not deficient. The evidence shows that counsel concluded the offenses contained different elements, preventing merger, and that he was concerned the trial court would impose consecutive sentencing. Counsel discussed with the Petitioner his desire for concurrent sentences because the offenses occurred at the same time. The trial court ordered concurrent sentences. Appellate counsel made a tactical decision not to raise a merger issue on appeal because she feared the State might raise the issue of consecutive sentencing in their brief. The record does not preponderate against the trial court's findings.

In Tennessee, the same elements test in Blockburger v. United States, 284 U.S. 299, 304 (1932), is the applicable test for determining whether multiple convictions under different statutes constitute the same offense for double jeopardy principles. State v. Watkins, 362 S.W.3 530, 558 (Tenn. 2012). At the time of the offense, second degree murder was defined as "[a] knowing killing of another." T.C.A. § 3-13-209 (2010). Aggravated child abuse, though, was defined as child abuse that "results in serious bodily

injury to the child." T.C.A. § 39-15-402(a)(1) (2003) (amended 2005). Child abuse was defined as "knowingly, other than by accidental means, treating a child . . . in such a manner as to inflict injury." Id. § 39-15-401(a). With regard to second degree murder, the State was required to prove beyond a reasonable doubt that a defendant knowingly killed the victim. A knowing killing is not an element of aggravated child abuse. We conclude that second degree murder and aggravated child abuse are not the same offense under double jeopardy principles and that counsel were not deficient in failing to raise the issue.

The Petitioner has failed to establish his claim by clear and convincing evidence and is not entitled to relief. In consideration of the foregoing and the record as a whole, the judgment of the trial court is affirmed.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE