FILED
03/01/2021
Clerk of the
Appellate Courts

# IN THE SUPREME COURT OF TENNESSEE
September 30, 2020 Session[1]

## STATE OF TENNESSEE v. SHALONDA WEEMS

**Appeal by Permission from the Court of Criminal Appeals
Criminal Court for Davidson County
No. 2015-B-1508     Monte Watkins, Judge**

────────────────────────────────

**No. M2018-02288-SC-R11-CD**

────────────────────────────────

This case examines a trial court's decision to grant, in part, a motion for judgment of acquittal in a criminal case. A Davidson County jury convicted Shalonda Weems of aggravated child neglect and reckless homicide following the death of her six-month-old daughter, Kar'mn. The autopsy investigation determined that Kar'mn's primary cause of death was malnutrition and dehydration and that the circumstances of her death were neglect. Ms. Weems was adamant in her statements to law enforcement that she fed Kar'mn, and medical records showed Ms. Weems took Kar'mn to all of her regularly scheduled doctors' appointments. After the jury's verdict, Ms. Weems filed a motion for judgment of acquittal as to both charges. The trial court granted the motion as to the aggravated child neglect charge but denied the motion as to the reckless homicide charge. The State appealed the trial court's decision to partially grant the acquittal, and the Court of Criminal Appeals affirmed. Because we conclude that a reasonable jury could have found all the necessary elements of the crime of aggravated child neglect, Tennessee Code Annotated section 39-15-402 (2003), beyond a reasonable doubt, we reverse the judgment of the Court of Criminal Appeals and vacate the trial court's decision to grant the motion for judgment of acquittal as to the aggravated child neglect charge. As a result, Ms. Weems' conviction for aggravated child neglect is reinstated. We remand this case to the trial court for further proceedings.

**Tenn. R. App. P. 11 Appeal by Permission; Judgment of the Court of Criminal Appeals Reversed; Judgment of Trial Court Vacated, in Part, and Remanded**

JEFFREY S. BIVINS, C.J., delivered the opinion of the Court, in which CORNELIA A. CLARK, SHARON G. LEE, HOLLY KIRBY, and ROGER A. PAGE, JJ., joined.

──────────────

[1] We heard oral argument through videoconference under this Court's emergency orders restricting court proceedings because of the COVID-19 pandemic.

Herbert H. Slatery III, Attorney General and Reporter; Andrée Sophia Blumstein, Solicitor General; Garrett D. Ward, Assistant Attorney General; Glenn R. Funk, District Attorney General; Pamela Anderson, Assistant District Attorney General; and Ross Bourdeaux, Assistant District Attorney General, for the appellant, State of Tennessee.

Michael Colavecchio, Nashville, Tennessee, for the appellee, Shalonda Weems.

## OPINION

### I. Factual and Procedural Background

The defendant, Shalonda Weems, found her six-month-old daughter, Kar'mn Weems, in her crib the morning of March 3, 2005, barely breathing and turning blue. Emergency responders transported Kar'mn to Vanderbilt Hospital where she was pronounced dead at 8:45 a.m. Kar'mn's body was then transported to the Davidson County Medical Examiner's Office for an autopsy. The medical examiner's report concluded that Kar'mn's cause of death was "dehydration and malnutrition" with "interstitial pneumonitis"[2] as a contributory cause. Her manner of death was "homicide," and the circumstances of her death were "neglect." In June of 2015, more than ten years after Kar'mn passed away, Ms. Weems was indicted for aggravated child neglect, Tennessee Code Annotated section 39-15-402 (2003),[3] and felony murder, Tennessee Code Annotated section 39-13-202(a)(2) (2003),[4] related to Kar'mn's death. The case proceeded to a three-day jury trial in which Ms. Weems was convicted of aggravated child neglect and reckless homicide, a lesser-included offense of felony murder. Ms. Weems filed two motions for judgment of acquittal, one after the conclusion of the State's proof and one after the jury announced its verdict. The trial court denied the first motion but granted the second motion as to the aggravated child neglect charge only. The trial court denied the motion as to the

---

[2] An inflammation of the lungs.

[3] All references to section 39-15-402 in this opinion are to the version of the statute that was in effect September of 2004 to March of 2005, the dates alleged in the indictment. The statute has since been amended. See Tenn. Code Ann. § 39-15-402 (2018 & Supp. 2020).

[4] All references to section 39-3-202(a)(2) in this opinion are to the version of the statute that was in effect September of 2004 to March of 2005, the dates alleged in the indictment. The statute has since been amended. See Tenn. Code Ann. § 39-13-202(a)(2) (2018).

reckless homicide charge and entered a judgment of conviction. The State appealed the trial court's decision to partially grant the second motion for judgment of acquittal.[5]

### a. Jury Trial

The State's proof consisted of testimony from law enforcement officers, the medical examiner, and the owner of the child's daycare center. The State also presented to the jury Kar'mn's medical records, recordings of Ms. Weems' interviews with police, and photographs of Kar'mn's autopsy and Ms. Weems' apartment at the time of Kar'mn's death. The record reveals that the investigation in this case was somewhat fragmented—it was initiated shortly after Kar'mn's death in 2005 by Detective Joe Cooper with the Metropolitan Nashville Police Department's Youth Services Division and then appears to have stalled until it was reassigned in 2014 to Detectives Selene Julia and John Grubbs in that same division. There is no indication from the testimony at trial, or from the record, that the investigation was ongoing during the nine-year period from 2005 to 2014 or that any new evidence was discovered from 2005 to 2014.[6]

Detectives conducted multiple interviews with Ms. Weems regarding Kar'mn's death, three in 2005 on March 3rd, March 14th, and October 21st, and one in July of 2014. The interviews from March 3rd and October 21st of 2005, as well as the interview from July of 2014, were recorded and played for the jury. The March 14, 2005 interview was not recorded, but Detective Cooper testified about the content of the conversation.

According to the March 3, 2005 interview, Ms. Weems was nineteen years old at the time and lived in an apartment with her three children, her six-month-old daughter Kar'mn and her two sons. Ms. Weems was preparing to move and was frequently spending time at her mother's house. On March 2nd, the day before Kar'mn passed away, Ms. Weems was at her apartment with her three children. She woke up around noon, watched television, ate ice cream, and fed Kar'mn "milk, cereal, and baby food." Around 2:00 p.m., Ms. Weems gave Kar'mn a bottle of water and a bath before laying her down for a nap. Throughout the day, Kar'mn acted "normal," "ate well," and "kept rolling around on the

---

[5] The decision to deny the motion for judgment of acquittal as to the reckless homicide charge was not appealed to this Court.

[6] The record includes email communication between the district attorney's office and investigators. It appears that an indictment was prepared in 2005 charging Ms. Weems with responsibility for Kar'mn's death; however, the district attorney's office decided to forgo presentment to the grand jury at that time in lieu of additional investigation. The record does not contain any other information on why the charges were brought over ten years after Kar'mn passed away.

bed." Ms. Weems fed Kar'mn another bottle around 6:00 p.m. and again around 8:30 p.m. At six-months-old, Kar'mn was eating a combination of foods and liquids including baby food out of a jar or milk, juice, or water out of a bottle. The bottle at 8:30 p.m. contained "milk with cereal and . . . apple sauce." While all three children often slept in one bed with Ms. Weems, Kar'mn slept in her crib the night of March 2nd. The crib and Ms. Weems' bed were in the same room.

Ms. Weems checked on her daughter around 11:00 p.m. on March 2nd and then in the early-morning hours of March 3rd at 3:00 a.m. and 5:00 a.m. At all times, Kar'mn was asleep. Ms. Weems got out of bed around 6:50 a.m. on March 3rd and poured her two sons juice. Around 7:30 a.m., Ms. Weems went into the bedroom and noticed her daughter was lying on her back "looking funny" and was barely breathing. Ms. Weems began to cry and called her mother, Kar'mn's grandmother, Velina Dixon. Ms. Weems did not understand why her daughter passed away because "she was fine" the night before.

According to Detective Cooper, in the March 14, 2005 interview, Ms. Weems explained she had been recovering from an illness herself a few days before Kar'mn passed away, and she had been staying at home with her children. On March 1st, Kar'mn developed a fever from teething, and Ms. Weems gave her Children's Tylenol. On March 2nd, the day before Kar'mn's death, Ms. Weems fed Kar'mn a bottle of milk, cereal, and apple sauce at 7:00 a.m., a bottle of water around 10:30 a.m., a bottle of juice around 1:00 p.m., a bottle of milk and cereal at 4:00 p.m., a small jar of baby food and ice cream at 7:00 p.m., and a small amount of baby food at 11:00 p.m.

According to Ms. Weems' October 21, 2005 interview, Kar'mn was enrolled in daycare starting in January or February of 2005 and Ms. Weems had to pre-prepare approximately eight bottles each day for Kar'mn to eat while at daycare. Kar'mn ate, on average, four times while at daycare: 9:00 a.m., 11:00 a.m., 2:00 p.m., and 4:00 p.m. Ms. Weems provided bottles that contained a combination of cereal, baby food, and milk or contained water or juice. Typically, the first bottle contained milk and cereal for breakfast, the second bottle contained water with a little bit of sugar, the third bottle contained juice, and the fourth bottle was "another milk bottle" with baby food like sweet potatoes. At six-months-old, Kar'mn had started eating cereal, milk, and baby food mixed together "off the plate" with a spoon instead of from the bottle when she was at home. The night before Kar'mn passed away, Ms. Weems fed her a bottle at approximately 8:00 p.m. and 10:00 p.m. before Kar'mn went to sleep.

Also according to the interview, the weekend before Kar'mn passed away, on February 26 or 27, 2005, Kar'mn stayed at Ms. Dixon's house. While Ms. Weems was not

4

certain, she believed Ms. Dixon had formula and baby food so Ms. Weems did not provide any. Ms. Weems felt sick but was feeling better by Tuesday, March 1st. Kar'mn had a fever "two days before the . . . incident happened," so Ms. Weems gave her "Tylenol Infant." During the days leading up to Kar'mn's death, Ms. Weems did not take her children to daycare because her car was not working. On March 1st, a relative came to watch the children for approximately thirty minutes while Ms. Weems ran an errand. Ms. Weems described Kar'mn as "fine," "eating and everything," but that she may have felt a little warm. On Wednesday, March 2nd, Ms. Weems was at home with her three children all day. That night, Kar'mn was "rolling up and down the bed," a new developmental milestone. Before going to sleep, Ms. Weems fed Kar'mn the "last little bottle" of "cereal, milk, and baby food" around 10:00 p.m., and Kar'mn "went right to sleep." Ms. Weems stated that Kar'mn was "fine" the day before her death and that her death was "just all of the sudden."

Regarding Kar'mn's medical care, Ms. Weems stated that she had taken Kar'mn to her regularly scheduled doctor's appointments. When Ms. Weems initially brought Kar'mn home from the hospital, she had to change food from milk-based to soy-based formula because Kar'mn "kept gagging and throwing [the milk] back up." According to Ms. Weems, the pediatrician had to help her mix the formula to water ratio correctly because, at first, Ms. Weems was using too much water and not enough formula. Ms. Weems denied that she did not have enough food to feed Kar'mn because she received food stamps and stated there was "always food in the house."

Halfway through the interview, when asked what she believed caused Kar'mn's death, Ms. Weems answered "SIDS," sudden infant death syndrome. Detectives then told her that Kar'mn's autopsy determined the cause of death was "dehydration and malnutrition" with a "secondary cause of pneumonia" and that this case had been "classified as a homicide." After learning this, Ms. Weems maintained that she "fed [Kar'mn] before she went to sleep." Ms. Weems was in disbelief that the child was malnourished and did not have food in her stomach. Ms. Weems acknowledged that she was Kar'mn's caretaker, responsible for keeping Kar'mn alive. Ms. Weems offered that Kar'mn's dehydration could have been because Ms. Weems toggled between the heat and air-conditioning when sick earlier in the week. The following exchange regarding feeding Kar'mn occurred:

> [DETECTIVE 1]: Alright. So just try to work and help yourself by telling the truth about what you can remember.
>
> WEEMS: Aww, I'm telling the truth. That's what I'm saying.

5

[DETECTIVE 1]: Okay.

WEEMS: Yea, but I did feed her. That's what I am saying.

[DETECTIVE 1]: I mean, accidents happen.

[DETECTIVE 2]: Well-

WEEMS: Nah, it wasn't no accident.

[DETECTIVE 1]: Alright. I mean, as far as, I mean, not an accident, but accidents can happen as far as, without you even knowing-

WEEMS: Uh-huh.

[DETECTIVE 1]: If you're not, if, if you were cutting back on the, on the food.

WEEMS: I wasn't cutting back on the food though.

[DETECTIVE 1]: If you were, you know, not giving them enough liquids, you know.

WEEMS: I was giving her food though, that's what I am saying. That's what I can't understand.

[DETECTIVE 1]: Yeah.

[DETECTIVE 2]: Well you, you can give a child food and still, if you're not giving them adequate, giving him or her adequate amounts-

WEEMS: Yeah.

[DETECTIVE 2]: The, the child's not gonna thrive and digress and-

WEEMS: The days that, the days that she was feeling bad she wasn't eating as much though.

6

Ms. Weems reiterated that Kar'mn had been sick on March 1st but was "getting better because she was eating more" the day after. On March 2nd, the night before she died, "[Kar'mn] had [sic] ate and everything." Ms. Weems stated that Kar'mn had a bowel movement and a wet diaper but that she had not "had as many" right before she passed away because she had been sick.

Ms. Weems' July 2014 interview proved to be difficult for her in recalling exact details from the days surrounding Kar'mn's death. Throughout the interview, Ms. Weems attributed her memory lapse to the nine-year gap in time and not being able to remember that far back. For example, she stated that she "maybe" fed Kar'mn "every three to four hours" but could not remember what Kar'mn was eating at six-months-old, formula or other baby food. She recalled that Kar'mn may have had to change her milk or formula once, and that "[she] tried to breast feed one time and it didn't work out." At first, Ms. Weems did not think that Kar'mn had any other problems with eating that she could remember. Later in the interview, Ms. Weems was more confident that Kar'mn had trouble gaining weight but that her weight was being monitored at all of her scheduled doctor appointments.

At one point, Ms. Weems expressed that "[she] thought [the investigation into Kar'mn's death] was over." The following exchange occurred regarding Kar'mn's cause of death:

> [DETECTIVE]: Did you ever call anybody?
>
> WEEMS: Uh-uh.
>
> [DETECTIVE]: And ask what happened to your baby?
>
> WEEMS: Nah, I thought, I thought they told me that she had SIDS.
>
> [DETECTIVE]: Who told you that?
>
> WEEMS: Before I, it was either before I left the hospital or I can't say the detective, detectives but that's what they told me and that's why the case was closed. That's why I was like, it's still open. I didn't know it was still open.

Ms. Weems read about possible dehydration "in the paper" but could not recall whether the detectives specifically told her that the cause of death was malnutrition and dehydration.

Ms. Weems continually stated that it "[did not] sound right" that Kar'mn had no food in her system. Ms. Weems offered multiple explanations as to why Kar'mn may have been dehydrated or had nothing in her stomach at the time of death, including that Kar'mn may have "throw[n] up in her bed," that she maybe "ha[d] a stomach virus," that there may have been a defect in the nipple of the bottle Kar'mn ate from that did not allow her to get the food, or that there were two or three bottles found under Kar'mn's crib that maybe Kar'mn did not eat but Ms. Weems thought she ate. Ms. Weems admitted propping a bottle up for Kar'mn to feed off of when Kar'mn was in her "seat" but denied leaving the bottles in Kar'mn's crib when she laid her down to sleep. Ms. Weems "d[id] remember giving [Kar'mn] something" on March 2nd but could not remember when.

At one point in the interview, Ms. Weems remembered that Kar'mn had a virus shortly before she passed away but could not remember the exact dates of the illness. When the detectives showed Ms. Weems pictures from Kar'mn's autopsy, Ms. Weems stated Kar'mn looked "dehydrated" but that "[she] wouldn't've starved [Kar'mn] for no [sic] four days." Even though Ms. Weems struggled to remember if or how many bottles Kar'mn ate the day before she died, she was adamant that she fed Kar'mn right before putting her to sleep. Over an hour and thirty minutes into the interview, Ms. Weems expressed that they were "not getting nowhere [sic]." The detective proceeded to ask ten more times, "Do you have any reason for not feeding her?" Ms. Weems continued to assert that she did feed Kar'mn and had no reason not to feed her.

Testimony from law enforcement described Ms. Weems "lack of emotion" when she learned of Kar'mn's manner of death. While detectives agreed that Ms. Weems' statements were consistent that she fed Kar'mn, there were discrepancies in the time and substance of the feedings in her different statements. One detective, specifically, "felt like the medical records spoke for themselves . . . [and] whether Ms. Weems chose to admit or not she did not feed her baby was up to her." Cross examination revealed that some items in Ms. Weems' apartment were not collected as evidence, such as a pillow that Kar'mn could have thrown up on, and that detectives never asked whether Kar'mn had been spitting up food.

Photographs of Ms. Weems' apartment showed clothes and trash piled throughout the living room, bedrooms, and hallway, and there was a baby pillow and rag on the couch. In Ms. Weems' bedroom, there was an adult-sized mattress without sheets and a baby's

crib. The second bedroom had two, child-size beds with sheets on them. Photographs of the kitchen showed dirty dishes piled in the sink and containers with food in them on the stove.

According to Laura Owens, the daycare owner at Creative Academy, Kar'mn attended daycare from January 2005 until March 2005 when she passed away. Ms. Weems sent all three of her children to Creative Academy and always kept the children "clean and neat." It was Ms. Weems' responsibility to provide bottles for Kar'mn at the daycare. Ms. Owens told Ms. Weems that "she was feeding her baby wrong" because Ms. Weems was providing only juice and water bottles and not enough formula. Ms. Owens requested that Ms. Weems provide more formula bottles. Approximately three to four days before Kar'mn died, Ms. Owens refused to accept Kar'mn at daycare because Kar'mn appeared sick, per daycare policy. Ms. Owens viewed pictures of Kar'mn from the autopsy and did not remember the child ever looking that ill.

Kar'mn's medical records showed that she was born September 5, 2004, weighing approximately six pounds and ten ounces. Initial notes indicated that Ms. Weems was bottle feeding Kar'mn on September 5th and 6th but switched to breastfeeding on September 7th before being discharged from the hospital. Ms. Weems was instructed on and showed proficiency in feeding Kar'mn, and Kar'mn tolerated her feedings well. By the time Kar'mn and Ms. Weems were discharged, Kar'mn was feeding every two to four hours and producing soiled diapers.

Due to Ms. Weems' age and socioeconomic status, she was enrolled in the Healthy Start Program, which provided home visits by a nurse, as well as other social services. Ms. Weems had been referred to a social services worker "due to [her] teen status and pregnancies in rapid succession" and was given forms and information on how to enroll in the Supplemental Nutrition Program for Women, Infants, and Children ("WIC") and medical insurance for Kar'mn. By the time Kar'mn was discharged, she weighed six pounds and seven ounces and had two follow-up appointments scheduled for September 10 and September 23.

At the follow-up visit on September 10, 2004, Kar'mn weighed 6.19 pounds, in the eighth percentile for weight. Kar'mn appeared "well developed, well nourished; alert and vigorous." There was a concern for "poor intake since discharge" noted in the record, and Ms. Weems reported switching between breastfeeding and bottle-feeding soy-based formula due to a history of lactose intolerance with her other two children. Kar'mn was regularly producing soiled diapers and sleeping for two to four hours after feeding, but, as noted in the medical record, there was "possible dehydration from inadequate intake." Ms.

9

Weems was instructed to feed Kar'mn soy formula and follow-up in three days to assess weight and intake over the weekend.

On September 13, 2004, Kar'mn weighed 6.5 pounds, in the eleventh percentile for weight. According to the medical record, Kar'mn appeared "well developed, well nourished; alert and vigorous." After Ms. Weems was instructed to use soy-based formula at the last appointment, Kar'mn had been "feeding, stooling, and voiding well . . . and ha[d] gained [five ounces.]"

At Kar'mn's two-week check-up on September 23, 2004, notes from the record indicate "[p]oor weight gain." Kar'mn had lost approximately ten percent of her birth weight, weighing only 6.13 pounds, in the third percentile for weight. One note in the record stated:

> Mom says that [Kar'mn] takes [five to six ounces] every [two to three] hours but on further questioning this seems unlikely. Mom says that she sleeps through the night, and really only takes [three to four] feeds during the day.
>
> . . .
>
> Mom has her Good Start [formula] with her today and can demonstrate how to mix the formula correctly. With her last baby[,] she admitted to occasionally adding extra water to make the formula go farther, but denies doing that now.

The healthcare professional made the following recommendations:

> Advised [Ms. Weems] to wake [Kar'mn] up during the night for a feed; minimum volume of feeds [fifteen ounces] per day . . . . Advised [Ms. Weems] to give [three ounces] at least five times per day. Mom agrees to come in next week for a repeat weight check.

At Kar'mn's two-month check-up on November 24, 2004, records indicate that she was "alert" and "happy," exhibiting "[n]ormal growth" and "[n]ormal development." Kar'mn weighed 9.5 lbs, in the seventh percentile for weight. Ms. Weems stated that she was using Good Start formula and participating in WIC. The healthcare professional noted: "Congratulated mom on [Kar'mn's] excellent growth. Mom has done an excellent job given young age, [sic] and having three babies all under the age of [four]." Kar'mn's next follow-up was scheduled for January, a four-month well child check-up.

10

Before the four-month check-up, on December 7, 2004, Ms. Weems brought Kar'mn to the Vanderbilt Emergency Room because she had a "[five]-day history of diarrhea [without] emesis[7]" The emergency room records indicated that Kar'mn was "alert," "well-appearing," and "well hydrated," weighing approximately eleven pounds. At that time, Kar'mn had been having diarrhea approximately every two hours. Intake notes showed that other children in the house also had diarrhea, and that, while Kar'mn was enrolled in daycare, she had not been going. Additionally, the records indicated that Kar'mn's fontanel[8] appeared "soft" but not sunken. Ms. Weems was instructed to encourage fluids and formula and follow-up in a few days if the diarrhea persisted or if Kar'mn stopped eating or producing soiled diapers.[9]

On January 26, 2005, Ms. Weems brought Kar'mn in for her four-month check-up. According to the records, Kar'mn appeared "well developed, well nourished; alert and vigorous." Kar'mn weighed 11.62 pounds, in the fourth percentile for weight. Ms. Weems alerted physicians to Kar'mn's visit to the emergency room and indicated that the illness had cleared up. At that point, Kar'mn was eating Good Start formula and had begun eating cereal and soft baby foods like sweet potato and apple sauce. Developmentally, Kar'mn was rolling from front to back and back to front. Kar'mn's next follow-up, her six-month check-up, was scheduled for March 5, 2005. Unfortunately, Kar'mn did not make it to that appointment because she passed away on March 3, 2005.

Dr. Amy (McMaster) Hawes performed Kar'mn's autopsy investigation at the Davidson County Medical Examiner's Office. She determined that Kar'mn's cause of death was "dehydration and malnutrition with interstitial pneumonitis as a contributory cause of death." The manner of death was "homicide," meaning the death was caused by the hands of another. The circumstances of death were "neglect." Dr. Hawes explained:

> [Kar'mn] had severe dehydration. There was evidence of acute and chronic malnutrition, as evidenced by, there was the absence of food and waste products, in other words, there was no feces in the colon. The thymus gland is an organ that children have, it's here in your chest, and it's part of your

---

[7] Emesis means vomiting.

[8] Dr. Hawes explained the anterior fontanel as the "soft spot" that appears "on the top of the [baby's] head."

[9] There is no indication from the record that Ms. Weems brought Kar'mn in for an additional follow-up in between the December 7, 2004 visit and the January 26, 2005 scheduled check-up.

immune system, an involution means it's shrunken or atrophied, so that organ in her chest had atrophied . . . . She had atrophy or loss of a lot of the fat around some of her internal organs, and she had fat in her liver cells where normally in an infant there really should not be any fat in the liver cells.

At the time of the autopsy, Kar'mn weighed 10.5 pounds. Her "eyes were slightly sunken in her head" and her "anterior fontanel," or the soft spot on the scalp, "was slightly sunken." A sunken fontanel, Dr. Hawes explained, "is an important thing to note in infants because it can indicate how well a child is hydrated." A sunken fontanel indicates dehydration. Kar'mn's overall skin was "dry and slightly doughy," which can also be "an indicator of [a child's] hydration status."

Dr. Hawes walked the jury through a few photographs of Kar'mn's body from the autopsy that showed the appearance of "doughy" skin, slightly sunken eyes, cracked and dry lips, and her slightly sunken fontanel. Upon examining Kar'mn's internal organs, Dr. Hawes noted that certain areas around the bowels, which normally contain a certain amount of supporting fat, "appeared sparse or less than what [she] would expect to see in an infant of [Kar'mn's] age." Additionally, supporting fat around the adrenal glands, which is "one of the things that [physicians] can use to assess how well an infant is and what their nutritional status is," was "pretty sparse." Dr. Hawes explained that if a child had normal amounts of this supporting fat around his or her organs but was then deprived of nutrition, the body would start using that supporting fat "as a source of energy," so Kar'mn's "sparse" level of fat was "an indicator that over a period of time . . . there was less than optimum nutrition status" provided to her.

Upon examining Kar'mn's gastrointestinal tract, "[t]he stomach was empty" and the colon "was completely free of any fecal material or stool." Dr. Hawes further explained that the contents of the stomach or bowels and rate of digestion can vary given what a person ate and that illnesses such as vomiting or diarrhea can cause the upper stomach or the bowels to empty sooner. However, for there to be "hardly anything from the very beginning to the very end" of the gastrointestinal tract, as was the case with Kar'mn, meant that "over a period of time . . . there [was] nothing of any . . . substance to go through to make stool." Given Kar'mn's medical history, which provided no indication of digestion or metabolic deficiencies related to poor digestion or weight gain, Dr. Hawes determined that her empty gastrointestinal tract was "unusual."

The remainder of Dr. Hawes' internal exam revealed the Kar'mn had concentrated, dark-colored urine, which is an indicator of dehydration. Kar'mn's thymus gland, which "can be an indicator of a child's overall well-being, chronic illnesses, [and] chronic

nutrition" was "slightly atrophic or shrunken and small" as a result of being under "chronic stress." "Chronic" meant that it was something that occurred long-term rather than "acute," meaning more short-term. Other tests were conducted using fluid from Kar'mn's eyes, "the best indicator that [the medical examiner had] to indicate dehydration," and that fluid showed high levels of sodium, indicating dehydration. Kar'mn's chloride levels were also high, another indicator of dehydration. Kar'mn's kidney function was elevated, Dr. Hawes testified the "most common cause of that [being] severe dehydration."

Finally, Dr. Hawes testified that her findings from the autopsy were inconsistent with a child who "had been fed cereal, milk[,] and apple sauce within [twenty-four] hours of death" or a child who was "fed liquids consistently throughout the day up until the evening hours." Dr. Hawes concluded that her findings, in addition to the doughy appearance of the child's skin, her slightly sunken eyes, and dried and cracked lips, were consistent with dehydration and malnutrition. Dr. Hawes did not receive any reports that Kar'mn had been sick in the days leading up to her death, only that Kar'mn had a fever.

While conducting the autopsy investigation, Dr. Hawes created a growth chart plotting Kar'mn's weight and weight percentile at her medical visits during her six months of life. Dr. Hawes explained that when analyzing the growth chart, the actual weight percentile was not as important as whether the child maintained the same curve on the growth chart as he or she developed. A sharp decline or incline in percentile could indicate certain medical conditions tied to weight gain. At birth, Kar'mn weighed "somewhere between the fifth and tenth percentile." A month or so later, she was "up to about the [tenth] or [twenty-fifth] percentile," and when she was "three or four-months-old, she drop[ped] down to the tenth percentile." At six-months-old, Kar'mn dropped to "below the [fifth] percentile," and her weight dropped off the growth curve picture. Kar'mn's weight at death was 10.5 pounds, down 1.1 pounds from her previous appointment in January. According to Dr. Hawes, if Kar'mn were to have stayed along the same growth curve, she should have weighed approximately thirteen pounds by March.

At the close of the State's proof, defense counsel moved for a judgment of acquittal, "specifically in count one of the indictment," charging Ms. Weems with aggravated child neglect. Counsel argued the State failed to prove Ms. Weems "knowingly neglected" Kar'mn, a necessary element of the crime. Additionally, counsel argued that an acquittal should be granted as to the second charge, second-degree murder,[10] because "the State . . .

---

[10] There is no indication in the record as to why second-degree murder rather than the indicted offense of felony murder was charged to the jury. However, that issue is not before us on appeal nor is it necessary for the Court's decision today.

13

failed to carry its burden in proving that what Ms. Weems did was a knowing act." In response, the State argued:

> [T]he proof has been that [Ms. Weems] knew how to feed a child; she had been trained; she knew that she was not feeding her child correctly. She had been told by the daycare worker. . . . She was the sole caretaker of the child, and the medical proof is that the child was not fed. The child had no food whatsoever in its entire gastric system.
>
> The physical evidence, the scientific evidence is that this child died of severe dehydration and malnutrition. These symptoms would have been noticeable, this would have been something Ms. Weems, had she gone in the bedroom to check on her child or feed her child, would have known. She also, along with neglect, also includes not just failure to feed, but also failure to provide medical treatment.

In response, the trial court expressed that it "ha[d] been thinking about the knowingly aspect quite a bit during the course of [the] trial, and admittedly, [it] ha[d] some difficulty with [it], as to both counts." Ultimately, the trial court denied the motion, reasoning that "a jury question ha[d] been raised with respect to each count, and it [was] for the jury to decide."

Ms. Weems' proof consisted of testimony from her mother, Kar'mn's grandmother, Velina Dixon. Around the time of Kar'mn's death, Ms. Dixon saw Ms. Weems and Kar'mn approximately once per week. Ms. Dixon "knew [Kar'mn] was having stomach issues" and "[p]roblems digesting her food." The weekend before Kar'mn passed away, Ms. Dixon went over to Ms. Weems' apartment because Ms. Weems had the flu. During that visit, Ms. Dixon described Kar'mn as "ha[ving] a cold." Also during that visit, Ms. Dixon observed Ms. Weems feed Kar'mn, burp Kar'mn, and Kar'mn spit up milk. On other occasions, when either Ms. Weems would bring Kar'mn to Ms. Dixon's house or Ms. Dixon would go to Ms. Weems' apartment, Kar'mn would "drink some of her milk, but she would constantly spit it up." Ms. Dixon observed milk in Ms. Weems' home and brought milk for the baby to Ms. Weems on at least one occasion. Detectives questioned Ms. Dixon at least one time at the hospital after Kar'mn's death, and then she spoke to detectives again when the case was reassigned in 2014. Following Ms. Dixon's testimony, both sides rested and the case was submitted to the jury. After deliberation, on September 27, 2018, the jury found Ms. Weems guilty of aggravated child neglect and reckless homicide.

14

### b. *Second Motion for Judgment of Acquittal*

Pursuant to Rule 29(e) of the Tennessee Rules of Criminal Procedure, Ms. Weems renewed her motion for judgment of acquittal on both counts, arguing that the State had "failed to prove, beyond a reasonable doubt, that [she] acted knowingly as to the allegation in Count 1, and that [she] acted recklessly as to the allegation in Count 2." The State's response relied heavily on the medical testimony and evidence from the autopsy investigation conducted by Dr. Hawes. The State argued that the "evidence clearly established an ongoing course of neglect that resulted in [Kar'mn's] death, which satisfies the serious bodily injury element of aggravated child neglect." Additionally, the State argued that "[Ms. Weems] stated that she knew she had to feed her child" and that "[f]ailure to properly feed a child under the age of six months resulting in her death clearly meets and exceeds the reckless element of reckless homicide."

At the hearing on the motion on October 31, 2018, the trial court stated:

> [A]t the end of the State's proof, when the motion for judgment of acquittal was first argued, the [c]ourt had some question about the knowingly aspect of particularly count one, as well as count two, for that matter, but as it turned out, the jury convicted in count two on reckless homicide. So[,] the issue of knowingly was not a real issue with respect to count two.

Additionally, the court stated, as to the aggravated child neglect charge, it "did not accept the jury's verdict" and that it "had some real concerns" about the verdict. The trial court held that "the evidence was not sufficient" as to count one, aggravated child neglect, and granted the motion for judgment of acquittal as to that count only.

In the trial court's December 5, 2018 order detailing its reasoning as to the decision to grant, in part, the motion for judgment of acquittal, the court expressed that it "had serious doubt regarding whether there was sufficient evidence of the 'knowing' element of count one of aggravated child neglect [but] allowed it to go to the jury." However, "[a]fter the announcement of the verdict, [it] did not accept the verdict on the record."[11] Examining the evidence at trial, the court highlighted nine key facts:

> (1) the child was found on March 3rd[,] 2005 not breathing, (2) attempst [sic] were made to revive the child, (3) family members were called, (4)

---

[11] This part of the transcript of the proceedings, the jury's verdict and the trial court's statement thereafter, was not provided in the record to this Court.

15

911 was called, (5) the Metro Nashville Police Department interviewed family, medical person[nel,] and caretakers in 2005 when the incident occurred and again in 2014, (6) the defendant was indicted in 2015 as the result of the interviews conducted [in] 2014, (7) the defendant testified that she fed her child, (8) the daycare owner, Laura Owens, testified that the child was sick and could not attend daycare and that she did not look like the photograph that was taken on the day of her death a week prior, and (9) Dr. Amy Hawes testified that there was an absence of food and waste products in the gastrointestinal system.

The trial court held that "observing the evidence in the light favorable to the prosecution," it "d[id] not accept the verdict in [c]ount 1 for insufficient evidence regarding [Ms. Weems'] *mens rea* of 'knowing,'" a necessary element for conviction under Tennessee Code Annotated sections 39-15-401 and -402 (2003). The State appealed the trial court's decision to the Court of Criminal Appeals.

### c. Court of Criminal Appeals

On appeal, the State argued that the trial court did not properly exercise its standard of review when considering the motion for judgment of acquittal. The Court of Criminal Appeals summarized the findings of the autopsy investigation, Kar'mn's medical records and doctor visits, and Ms. Owens' testimony from Creative Academy daycare. State v. Weems, No. M2018-02288-CCA-R3-CD, 2020 WL 119618, at *17–18 (Tenn. Crim. App. Jan. 10, 2020) (citations omitted), perm. app. granted, (Tenn. June 3, 2020). The court reiterated, "Dr. Hawes testified that she was not provided with a history of Kar'mn's being sick during the week before her death when she performed the autopsy and issued her report stating the cause of death." Id. at *18. Furthermore, the court focused on Ms. Dixon's testimony that Ms. Weems had milk in her apartment and that Ms. Weems and Kar'mn were both ill the weekend before Kar'mn passed away. Id. The court described Ms. Weems' interactions with detectives: "the detectives repeatedly asked rhetorical questions," Ms. Weems "never wavered in her claim that she fed Kar'mn," and Ms. Weems "offered a possible explanation that she may have 'propped' Kar'mn's bottle so as to allow her to self-feed or that the hole in the nipple might have been too small for the cereal and formula mixture to flow through." Id.

Ultimately, the court affirmed the trial court's decision to partially grant the motion for judgment of acquittal. The court reasoned, "It is unclear what happened in the last few days of Kar'mn's short life" but the "the evidence was insufficient to prove that [Ms.

Weems] *knowingly* did not feed Kar'mn or *knowingly* neglected Kar'mn." Id. The State filed a timely application for permission to appeal to this Court.

## II. Analysis

The State raised one issue on appeal to this Court: whether the Court of Criminal Appeals erred in affirming the partial motion for judgment of acquittal by "(1) substituting its own credibility determinations for those of the jury, (2) determining the weight to be given to witness testimony, (3) failing to consider the evidence in the light most favorable to the prosecution, and (4) failing to disregard countervailing evidence." We consider this issue and the related issue of whether the trial court erred in its initial decision to grant the judgment of acquittal as to Ms. Weems' aggravated child neglect charge.

### a. *Standard of Review*

Under Tennessee law, the trial court applies the same standard of review when examining a motion for judgment of acquittal as does the appellate court when a party challenges the sufficiency of the evidence underlying the jury's verdict. State v. Carroll, 36 S.W.3d 854, 869 (Tenn. Crim. App. 1999) (citing State v. Ball, 973 S.W.2d 288, 292 (Tenn. Crim. App. 1998)). The inquiry is limited and centers around "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." State v. Little, 402 S.W.3d 202, 211 (Tenn. 2013) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)); see also Tenn. R. App. P. 13(e). Further, all reasonable and legitimate inferences from the evidence must be drawn in favor of the prosecution and all countervailing evidence discarded. See State v. Collier, 411 S.W.3d 886, 893 (Tenn. 2013) (quoting State v. James, 315 S.W.3d 440, 455 (Tenn. 2010)). The trial court, and the reviewing court on appeal, is not to reweigh the evidence or reassess the credibility of the witnesses. State v. Stephens, 521 S.W.3d 718, 724 (Tenn. 2017). The decision to deny or grant a motion for judgment of acquittal is a question of law, which this Court reviews de novo with no presumption of correctness. See Little, 402 S.W.3d at 211.

### b. *Discussion*

This case paints a troubling and contrasted picture. On one hand, Ms. Weems, a teenage mother of three, appeared to provide for Kar'mn by taking her to all scheduled doctor appointments and bringing her to the emergency room when she had an unexpected illness. Additionally, at least two witnesses testified that both Ms. Weems and Kar'mn were sick in the days leading up to Kar'mn's death and that Kar'mn had a history of spitting up

17

after feeding. Over the course of the investigation, Ms. Weems was adamant that she fed Kar'mn regularly up until the time she put Kar'mn to bed on March 2, 2005. On the other hand, Dr. Hawes' autopsy investigation uncovered multiple indicators that Kar'mn suffered from chronic malnutrition and severe dehydration, including the unsettling discovery that Kar'mn had almost no food or waste in her gastrointestinal tract, meaning she had been without food or liquids for a twenty-four-hour period or more. Moreover, the daycare provider had to address Ms. Weems for not bringing sufficient food for Kar'mn, and Ms. Weems admitted to medical professionals that she watered down formula with her previous child to make it last longer.

Perhaps the most confounding part of this case, however, is the fact that the investigation into Kar'mn's death remained dormant for almost an entire decade. There is no indication from the record that there was an ongoing investigation or communication with health care providers, Ms. Weems, or other family members or that there was newly discovered evidence from the period of 2005 to 2014. Our decision today, however, must not be concerned with the competency or efficiency of the investigation into this matter, nor is this Court permitted to assign weight to the evidence or reassess the credibility of witness testimony presented at trial. Our decision today is strictly limited to whether the evidence at trial, viewed in the light most favorable to the State and with all reasonable inferences drawn in favor of the State, was sufficient for any reasonable jury to conclude that Ms. Weems committed all of the necessary elements of aggravated child neglect beyond a reasonable doubt. We are compelled to conclude that the evidence was sufficient.

At trial, the State was required to prove that Ms. Weems knowingly or intentionally acted in a way that "adversely affect[ed] [Kar'mn's] health and welfare" and those actions resulted in serious bodily injury to Kar'mn. See Tenn. Code Ann. §§ 39-15-401(a), 402(a)(1). The proof at trial showed that Kar'mn was born on September 5, 2004, weighing six pounds and ten ounces. Kar'mn's weight fluctuated at first but, after her two-week check-up, Kar'mn was able to feed and gain weight until her last recorded check-up on January 26, 2005, when she weighed 11.62 pounds. At the time of Kar'mn's death in March of 2005, however, she weighed 10.5 pounds. Kar'mn's growth chart, tracking her weight and weight percentile, showed slow but steady growth in the first few months, topping out around the twenty-fifth percentile in November. However, at the time of her death in March, Kar'mn's weight dropped below the fifth percentile.

Medical records indicated that Ms. Weems was instructed on how to prepare a bottle with formula and showed proficiency in how to feed Kar'mn from a bottle. Records also indicated that Ms. Weems admitted to previously watering down formula with her other children, but she later denied having done so with Kar'mn. Kar'mn's daycare provider

18

explained that she had to speak with Ms. Weems because she was "feeding her baby wrong," providing too many bottles of juice or water and not enough bottles with formula. However, Ms. Weems stated that there was "always food in the house" because she had access to resources like food stamps through WIC.

Ms. Weems' statements are consistent that she fed Kar'mn regularly and fed her a combination of milk or formula, baby food, or cereal throughout the day before she passed away. Ms. Weems had to give Kar'mn Children's Tylenol because she had a fever, but Ms. Weems continually described Kar'mn as being "fine" and eating normally the day before she passed away. Ms. Weems stated that she checked on Kar'mn after putting her down around 10:00 or 11:00 p.m. to sleep in her crib on March 2nd, and Kar'mn was sleeping and appeared normal each time. Only when Ms. Weems checked on Kar'mn around 7:30 a.m. did she appear "blue" and struggling to breathe.

The medical examiner's autopsy revealed that there was virtually no food, liquid, or substance in Kar'mn's gastrointestinal tract. In addition, the medical examiner identified a number of other indicators that Kar'mn was chronically malnourished and severely dehydrated. For example, Kar'mn had low levels of fat surrounding her internal organs, slightly sunken eyes, dry and cracked lips, and a slightly sunken fontanel. Kar'mn's skin appeared "doughy," her thymus gland was small or atrophied, and her bodily fluids indicated high levels of sodium and chloride. These adverse conditions appeared chronic in nature, something that happened over time, and, according to Dr. Hawes, a person regularly checking on the baby would have noticed that something was wrong. Ultimately, Dr. Hawes determined that Kar'mn's primary cause of death was malnutrition and dehydration. Dr. Hawes concluded that Kar'mn's manner of death was "homicide" and the circumstances were "neglect."

Furthermore, Dr. Hawes reached her ultimate conclusion after not only examining Kar'mn's body but also reading through her medical history. Nothing in the medical records indicated that Kar'mn had ongoing issues with digestion or other metabolic deficiencies. Dr. Hawes confirmed that she did not receive any personal history outside of medical records that indicated Kar'mn was sick in the days leading up to her death, only that she had a fever. Additionally, she explained that even if a person vomits or has diarrhea shortly before his or her death, it would not lead to the entire gastrointestinal tract being empty, as was the case with Kar'mn. As a result, Dr. Hawes determined that Kar'mn's physical state at death was inconsistent with a person who had been fed milk, cereal, baby food, or any other liquids regularly within twenty-four hours.

19

Based on our review of the record, the jury could have made a reasonable and legitimate inference from the evidence that Ms. Weems' statements that she fed Kar'mn were not credible based on the medical and scientific evidence provided by Dr. Hawes and Kar'mn's medical records. The medical and scientific evidence alone provides proof that Ms. Weems knew how to feed her child and that her child needed to eat often, that Kar'mn was able to gain and maintain weight, and that Kar'mn died as a result of chronic malnutrition and dehydration. There is certainly no "smoking gun" in this case, and Ms. Weems did not admit that she failed to feed Kar'mn. However, Tennessee courts have long recognized that a defendant's mental state, often an essential element in criminal statutes, is often proved by circumstantial evidence, which by its very nature requires the jury to make inferences and draw conclusions based on all of the evidence presented. See Hall v. State, 490 S.W.2d 495, 496 (Tenn. 1973); State v. Burns, No. M1999-01830-CCA-R3-CD, 2000 WL 1520261, at *3 (Tenn. Crim. App. Oct. 13, 2000). Accordingly, a reasonable jury could have concluded that Ms. Weems knowingly neglected Kar'mn by not feeding her and Kar'mn died as a result of that neglect.

After the verdict, in considering Ms. Weems' motion for a judgment of acquittal, the trial court identified the standard of review: to "observ[e] the evidence in the light favorable to the prosecution." The trial court then stated that it "d[id] not accept the verdict" as to aggravated child neglect because there was "insufficient evidence regarding [Ms. Weems'] *mens rea* of 'knowing.'" The trial court's order focused on nine major facts, including "the defendant testified that she fed her child" and "the daycare owner, Laura Owens, testified that the child was sick and could not attend daycare and that she did not look like the photograph that was taken on the day of her death a week prior." It appears that while the trial court essentially correctly identified the standard of review, it failed to disregard certain points of countervailing evidence or recognize the jury's ability to make inferences and conclusions from the evidence presented. Instead, the trial court appears to have made its own assessment of the credibility of Ms. Weems' and Ms. Owens' testimony and assigned it more weight than the medical testimony that showed Kar'mn suffered from chronic malnutrition and dehydration.[12]

Whether or not the trial court agreed with the credibility determinations of the jury, the weight the jury assigned specific testimony and evidence, or the conclusions the jury drew from the evidence is not of consequence to this appeal only because that is not what

---

[12] The Court of Criminal Appeals decision similarly identified the correct standard of review and then proceeded to reweigh the evidence and the credibility of the witnesses, while disregarding the jury's ability to make reasonable inferences and conclusions from the evidence presented at trial. Weems, 2020 WL 119618, at *16–18.

the trial court must do when ruling on a motion for judgment of acquittal. Those determinations are relevant only to the trial court's decision to accept the jury's verdict in its role as thirteenth juror. See State v. Ellis, 453 S.W.3d 889, 898–901 (Tenn. 2015) (differentiating the trial court's role when reviewing the legal sufficiency of the evidence and the trial court's role as thirteenth juror, the latter inquiry not requiring the "trial judge . . . to view the evidence in the light most favorable to the prosecution" and permitting the trial judge to "weigh the evidence himself as if he were a juror and determine for himself the credibility of the witnesses" (quoting State v. Johnson, 692 S.W.2d 412, 415 (Tenn. 1985) (Drowota, J., dissenting))). The record does not reflect any ruling by the trial court on a motion for new trial. Therefore, we express no opinion and make no determination on this issue.

In this case, the State was not required to prove that Ms. Weems knew Kar'mn was going to die or that Ms. Weems intended for Kar'mn to die for the jury to find all of the necessary elements of aggravated child neglect beyond a reasonable doubt. See State v. Prater, 137 S.W.3d 25, 33–32 (Tenn. Crim. App. 2003) ("[I]t is the actual act of treating a child in an abusive manner that must be knowing conduct; a defendant need not know that his or her conduct will result in serious bodily injury."). Accordingly, we reverse the Court of Criminal Appeals' decision to affirm the trial court's partial grant of the motion for judgment of acquittal as to the aggravated child neglect charge, and we vacate the trial court's order as to that charge only. As a result, Ms. Weems' conviction for aggravated child neglect is reinstated.

### III.    Conclusion

Based on the evidence presented at trial, we conclude that a reasonable jury could have determined that the State proved all of the necessary elements of aggravated child neglect. Therefore, we reverse the Court of Criminal Appeals' decision to affirm the trial court's partial grant of the motion for judgment of acquittal as to the aggravated child neglect charge. We vacate the trial court's partial grant of the motion for judgment of acquittal, and we reinstate the jury's verdict as to that charge only. We remand this case for further proceedings consistent with this opinion. Costs of this appeal are taxed to the State of Tennessee.

_____
JEFFREY S. BIVINS, CHIEF JUSTICE

21